## A10A2307. MINCEY v. GEORGIA DEPARTMENT OF COMMUNITY AFFAIRS.

(708 SE2d 644)

DILLARD, Judge.

In this personal injury action, we granted appellant Carolyn L. Mincey's application for interlocutory appeal to review the trial court's order denying her motion for a protective order and directing her to execute a release of her mental-health records to appellee Georgia Department of Community Affairs ("GDCA"). The trial court denied Mincey's motion after concluding that she waived the right to assert a mental-health privilege by providing evasive and/or false responses about her medical history to GDCA during discovery. The trial court further granted GDCA a continuance and reopened discovery as a sanction for Mincey's conduct pursuant to OCGA § 9-11-37. Because we conclude that Mincey's handling of discovery, albeit troublesome, did not amount to a decisive and unequivocal waiver of her mental-health privilege as the law requires, we reverse that aspect of the trial court's order and remand this case with direction. We affirm in all other respects.

Here, the record shows that in November 2006, Mincey was injured while riding as a passenger in a vehicle that was struck by a car being driven by a GDCA employee. Mincey thereafter sued GDCA, alleging that the accident was a result of the driver's negligence and further asserting that the driver was working within the scope, authority, and employ of GDCA at the time of the accident, thus rendering GDCA liable for her injuries. During discovery, Mincey reported that she suffered, as a direct result of the accident, damages that included "pain in both knees on a daily basis," a herniated disk in the lumbar region of her back, "inconsistent moods," and "daily bouts of fatigue and depression."

In written interrogatories, GDCA requested that Mincey identify "each and every physician or other practitioner of the healing arts who examined, diagnosed or treated" her during the ten years prior to the accident, and to further state "the nature and extent of any physical or mental disability, impairment, or handicap of any kind" from which she suffered at the time of the accident. After qualifying her response with an objection that the request was "overly broad and unduly burdensome," Mincey offered the names

of three doctors who previously treated her for three pre-accident conditions (i.e., the removal of a brain lesion, a blood transfusion, and a gastrointestinal procedure), but made no mention of any history of pain in her knees, back trouble, or depression. GDCA then served a third-party request for production of documents on each of the named pre-accident medical providers, in addition to the 13 medical providers that treated Mincey after the accident, and received records from each. Although Kaiser Permanente ("Kaiser") was not identified as a pre-accident medical provider, it was included in the names of facilities that rendered Mincey care after the accident. And while Mincey executed a release of the Kaiser records, she limited the release to those records dated on or after the date of the accident.

GDCA then deposed Mincey for the first time in September 2008, and, during the course of this deposition, asked her whether she suffered pain in her knees or lower back prior to the accident. After doing so, the following colloquy transpired:

[Mincey]: Prior to the accident?
[Counsel]: Prior to the accident.
[Mincey]: No. No.
[Counsel]: Had you ever experienced any sort of swelling in your knees prior to the accident?
[Mincey]: No.
[Counsel]: Any sort of stiffness prior to the accident?
[Mincey]: No.
[Counsel]: No recurrent sort of pains that you can think of prior to the accident?
[Mincey]: Nothing that didn't—if I did, it was just nothing that was a continued thing. I guess with age, a little bit of everything ache [sic] every now and then. But nothing abnormal or on a continuous basis.
[Counsel]: Is it the same for your lower back?
[Mincey]: No. I basically have never had problems with my back.

With respect to Mincey's mental health, she maintained (during this same deposition) that her struggles with depression directly resulted from the accident:

[Counsel]: I see from . . . some of the medical records that you might have a history of depression. I'm only interested in that, and you can answer this however you want. To the extent that this injury and taking pain medication and that

> sort of thing would, you know, worsen your mood or decrease your positive outlook—
>
> [Mincey]: I do deal with that now continuously. I don't have a history of it. . . . But since the accident I've dealt with depression, anxiety. . . .
>
> [Counsel]: Had you ever had—lets just take any time prior to the accident—had a diagnosis of depression?
>
> [Mincey]: No.
>
> . . .
>
> [Counsel]: Has anyone given you a diagnosis of depression after the accident?
>
> [Mincey]: Not necessarily a diagnosis, but that is something that I deal with because of it, but I have not been given a diagnosis of depression.
>
> [Counsel]: I understand. And prior to this accident, . . . no one had ever told you that you had any sort of degenerative changes in your lower back or in your knees?
>
> [Mincey]: No.

Despite Mincey's responses to questions about her medical history, certain medical records produced by Kaiser indicated that she may have indeed complained of similar ailments prior to the accident. For example, one computer-generated record contained a "Problem List" that included "arthralgia [pain] of knee" as an unresolved issue that was "noted" in January 2006, more than ten months prior to the accident. Moreover, that same medical record made references (from which one could infer) that the onset of Mincey's mood instability and/or depression may have pre-dated the accident, including reports that her "[m]ood ha[d] been worsening over the past two years [prior to the accident]," as well as containing notes attributing "much sadness" to a "decline of health over the past 7 years."

The discovery period ended in October 2008. In August 2009, GDCA sent a letter to Mincey's counsel requesting that Mincey sign a release authorizing the production of her complete medical records, including medical care pre-dating the accident as well as her mental-health records.[1] GDCA nonetheless announced at the calendar call in September 2009 that it was ready to proceed to trial, although it then

---

[1] Mincey claims that GDCA explained the delay in requesting the additional records by stating that it "had simply not gotten around to it." That alleged statement by GDCA does not appear in the record before this Court. Regardless, given the trial court's broad discretion in controlling discovery (discussed infra), the reason for the delay is irrelevant to our inquiry.

sent a second letter to Mincey acknowledging her refusal to sign the release by invoking the mental-health privilege, and conditioning its "ready" announcement upon the production of the records sought. GDCA further asserted in the correspondence that "at an absolute minimum, [GDCA] has the right to Mincey's medical records as they relate to her pre-existing problems with knee pain."

Mincey repeatedly asserted to both GDCA and the trial court that all of her nonprivileged medical records, including those from Kaiser, had been produced, and denied that she had withheld relevant or requested information during the discovery period. Nevertheless, in October 2009, GDCA filed a motion to compel the discovery of any medical records not already produced by Mincey, including those that would otherwise be protected by the mental-health privilege. In response, Mincey continued to assert that all nonprivileged medical records had been produced. She also maintained that GDCA was not entitled, in any event, to pursue further discovery because the discovery period had already ended.

GDCA thereafter subpoenaed the deposition of Kasier's custodian of records and ordered the custodian to produce all of Mincey's nonprivileged medical records. In response, Mincey filed a motion for protective order on the basis that the documents sought were included in the pending motion to compel and that discovery had expired.

The trial court denied Mincey's motion for a protective order and GDCA obtained the additional Kaiser records that it sought. The records from a May 2006 visit—six months prior to the accident—revealed that Mincey had previously received diagnoses of "osteoarthritis of [the] knee" and "strain of [the] lumbar region" of her back. On the day of that particular visit, Mincey had "pain, swelling and crunching of the affected joints, especially the left knee." Suggesting that the problems were not new, the record referenced Mincey's prior treatment, noting that her "symptoms have been improved by analgesics and intraarticular steroid injections" but "ha[d] not been improved by footwear and physical therapy." During this same visit, Mincey complained of "low[er] back pain," including "radicular symptoms involving both lower extremities[,]" and advised that she had a "[h]istory of intermittent back discomfort[.]"

The records further reflected the summary of an October 2009 telephone call from Mincey to her Kaiser doctor, placed on the same day that the parties held a teleconference with the trial judge regarding GDCA's attempt to obtain the additional medical records. The notes indicate that Mincey called to inquire about the January 2006 "arthralgia of the knee" reference that had prompted GDCA's

request for additional records. Her doctor's response to the reporting nurse read:

> Notify patient that this diagnosis was entered by [another doctor] and [Mincey] was prescribed an analgesic (generic DARVOCET N-100MG). The diagnosis indicates she had pain in the knee joint but not specifically from arthritis. *The diagnosis cannot be changed or deleted by me.* Schedule a followup visit with me for any persistent knee symptoms.

Finally, the newly obtained Kaiser records reflected that Mincey had been diagnosed with depression in July 2006, four months prior to the accident at issue.[2]

After conducting a hearing, the trial court issued an order on March 17, 2010, finding that Mincey's "deposition testimony regarding pre-existing conditions was evasive, and in some instances false" and that she "ha[d] not fully complied with the requirements of discovery, specifically including [GDCA's] discovery of [her] prior medical providers and pre-existing conditions." The trial court, therefore, concluded that Mincey "waived her mental health privilege by claiming inconsistent moods and bouts of depression as elements of her damages, and then electing to testify falsely regarding pre- and post-accident diagnoses of depression." The trial court then opened discovery for an additional three months, and directed that Mincey execute a release to authorize the disclosure of her mental-health records. This appeal follows.

1. Mincey argues that the trial court erred by ruling that she waived her mental-health privilege as a result of her conduct during discovery. We agree, in part.

At the outset, we note that the grant or denial of a motion for protective order lies within the sound discretion of the trial court, and we will reverse the court's decision in this regard only when it has abused its discretion.[3] Moreover, "[i]n determining whether a party has abused discovery, the trial court sits as trier of fact, and this Court will uphold a finding of wilful discovery abuse if there is any evidence to support it."[4]

Additionally, under Georgia law, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim

---

[2] GDCA deposed Mincey for a second time in March 2010. Mincey's counsel instructed her not to answer any question related to depression, either before or after the accident.

[3] *See McKesson HBOC, Inc. v. Adler*, 254 Ga. App. 500, 505 (3) (562 SE2d 809) (2002).

[4] *Santora v. Am. Combustion, Inc.*, 225 Ga. App. 771, 772 (1) (a) (485 SE2d 34) (1997).

or defense of the party seeking discovery . . . ."[5] But, "[a]s a matter of public policy, this state has long provided for the confidentiality of communications between [a mental-health professional] and patient."[6] Thus, in order to encourage a patient to speak freely to his or her mental-health professional, we declare such communications "absolutely privileged,"[7] and protect them from discovery in the absence of an affirmative waiver by the patient.[8] This is true regardless of whether "the patient's 'care and treatment or the nature and extent of his [or her] injuries (have been put) at issue in any civil . . . proceeding.' "[9]

Moreover, in the absence of an *express* statement of waiver, one seeking the disclosure of privileged mental-health records must establish a waiver by the patient's "decisive unequivocal conduct reasonably inferring the intent to waive[.]"[10] And, in this respect, we have previously held that a patient's affirmative act of calling his or her psychiatrist to testify at trial when the patient's mental health is at issue evinces an intent to waive the privilege,[11] but a failure to

---

[5] OCGA § 9-11-26 (b) (1).

[6] *Kennestone Hosp., Inc. v. Hopson*, 273 Ga. 145, 148 (538 SE2d 742) (2000) (footnote omitted); *see* OCGA § 24-9-21 (5)-(8) (deeming privileged all communications between a patient and a psychiatrist, a licensed psychologist, a licensed clinical social worker, a clinical nurse specialist in psychiatric/mental health, a licensed marriage or family therapist, and a licensed professional counselor); OCGA § 43-39-16 ("The confidential relations and communications between a licensed psychologist and client are placed upon the same basis as those provided by law between attorney and client; and nothing in this chapter shall be construed to require any such privileged communication to be disclosed.").

[7] *State v. Herendeen*, 279 Ga. 323, 325-26 (613 SE2d 647) (2005) ("[T]he purpose of the privilege is to encourage the patient to talk freely without fear of disclosure and embarrassment, thus enabling the psychiatrist to render effective treatment of the patient's emotional or mental disorders." (citations and punctuation omitted)).

[8] *See Herendeen*, 279 Ga. at 327; *Hopson v. Kennestone Hosp., Inc.*, 241 Ga. App. 829, 829 (526 SE2d 622) (1999) ("Communications between a patient and psychiatrist are absolutely privileged and not discoverable unless the patient affirmatively waives the privilege." (footnote omitted)); *Plunkett v. Ginsburg*, 217 Ga. App. 20, 21 (456 SE2d 595) (1995) ("[C]ommunications between a psychiatrist and patient are absolutely privileged and that privilege must be waived as a pre-condition of discovery." (citation, punctuation and emphasis omitted)).

[9] *Dynin v. Hall*, 207 Ga. App. 337, 339 (4) (428 SE2d 89) (1993) ("To hold that communications between the [patient] and her psychiatrist have lost their privileged character and are discoverable merely because they are the most objective evidence of the relevant issue of the [patient's] mental state would contravene the legislature's express intent." (citation omitted)). *But see Bobo v. State*, 256 Ga. 357, 359-61 (3), (4) (349 SE2d 690) (1986) (in the criminal context, a witness's statutory mental-health privilege must yield to a defendant's constitutional right to confront witnesses against him if the evidence in question is critical to his defense and substantially similar evidence is otherwise unavailable to him).

[10] *Herendeen*, 279 Ga. at 327 (citation and punctuation omitted). *See generally Mullis v. Bibb County*, 294 Ga. App. 721, 725 (3) (669 SE2d 716) (2008) ("Waiver is the voluntary relinquishment of a known right and may be established by express statements or implied by conduct. An implied waiver is one shown by a party's decisive, unequivocal conduct reasonably inferring the intent to waive." (punctuation and footnote omitted)).

[11] *See Griggs v. State*, 241 Ga. 317, 318 (3) (245 SE2d 269) (1978) (defendant who introduced testimony by his psychiatrist to bolster defense that he was mentally disturbed at

timely object to the discovery of privileged information does not.[12] Given these precedential strictures, we simply cannot conclude that Mincey's arguably misleading responses to opposing counsel's questions regarding a previous diagnosis of depression amounted to a "decisive" and "unequivocal" waiver of her mental-health privilege; nor can we find that Mincey's decision to answer the deposition question posed to her (whether she suffered from a history of depression), rather than object to it at the time the issue of depression was raised, constitutes an explicit waiver of this privilege.[13]

Nevertheless, we agree with the trial court that GDCA is entitled to the discovery of information disclosing whether Mincey was treated for mental-health-related issues prior to the accident and/or the dates of her pre-accident treatment for same. The privilege covers "communications and admissions" between the patient and the mental-health professional, and any information that the professional holds which has its origins in those communications.[14] But "the *fact* of employment of or treatment by a mental health provider and the dates thereof do not fall within the mental health privilege and may be disclosed."[15]

We therefore hold that the trial court erred in concluding that Mincey waived the mental-health privilege, and the trial court's order is therefore reversed to the extent it requires the production of any confidential communications made between Mincey and her mental-health-care providers. The trial court's order is affirmed,

---

the time of the crime waived any objection to the State cross-examining the witness and calling in rebuttal a second psychologist who also evaluated defendant); *Fields v. State*, 221 Ga. 307, 309 (2) (144 SE2d 339) (1965) ("'To call a physician to the stand, and examine him as a witness to one's physical condition formerly communicated to him, is a waiver of the privilege in regard to all of his knowledge of the physical condition asked about." (citation, punctuation and emphasis omitted)); *Trammel v. Bradberry*, 256 Ga. App. 412, 424 (6) (568 SE2d 715) (2002) ("Where a party calls his or her psychiatrist to testify at trial on the party's behalf, when the mental status of the party is in issue, this constitutes decisive, unequivocal conduct that reasonably implies the intent to waive the psychiatric privilege." (citations omitted)).

[12] *See Kennestone Hosp., Inc.*, 273 Ga. at 149 ("Given the importance of the privilege in encouraging and protecting confidential communications concerning the emotional and mental health of individuals, we hold that a party's silence and failure to act in response to a request for privileged matter from a nonparty health care provider or facility . . . does not waive the party's privilege by implication."). *Cf. Alston & Bird LLP v. Mellon Ventures II, L.P.*, 307 Ga. App. 640, 645 (4) (706 SE2d 652) (2011) (holding that plaintiffs did not waive the attorney-client privilege by inadvertently producing privileged documents during discovery).

[13] *See Kennestone Hosp., Inc.*, 273 Ga. at 149. *Cf. Alston & Bird LLP*, 307 Ga. App. at 645 (4).

[14] *See Herendeen*, 279 Ga. at 327.

[15] *Herendeen*, 279 Ga. at 327; *see also Kennestone Hosp., Inc.*, 273 Ga. at 148 ("[T]he fact that a patient has undergone psychiatric treatment and the dates of the care are not subject to the psychiatrist-patient privilege[.]"); *Cranford v. Cranford*, 120 Ga. App. 470, 472-73 (2) (170 SE2d 844) (1969) (same).

however, insofar as it allows GDCA to proceed with discovery of nonprivileged evidence relevant to Mincey's mental health care (as set forth supra). Accordingly, we remand this case to the trial court, so that it may conduct an in camera review of the records sought by GDCA to identify and redact privileged information contained therein in conformity with this opinion.[16]

2. Mincey further argues that the trial court abused its discretion by determining that her deposition testimony "was evasive, and in some instances false" and that her interrogatory responses were incomplete, and that it further erred by assessing sanctions against her pursuant to OCGA § 9-11-37 (a) (3), (d) (1). The trial court's sanctions included continuing the case and reopening discovery for a three-month period to allow GDCA to take depositions of doctors who treated Mincey and to subpoena additional documents; allowing GDCA to redepose Mincey; giving the parties until 30 days following the expiration of the reopened discovery period to identify expert witnesses;[17] and vacating the existing pretrial order so that it may be superseded by a new pretrial order after the additional discovery period concludes.

In matters involving discovery disputes, "[t]rial judges have broad discretion in controlling discovery, including the imposition of sanctions, and this Court will not reverse a trial court's decision on such matters unless there has been a clear abuse of discretion."[18] OCGA § 9-11-37 (a) (3) instructs the trial court that, as to depositions and discovery, "an evasive or incomplete answer is to be treated as a failure to answer," and OCGA § 9-11-37 (d) authorizes the court in such an event to "make such orders in regard to the failure as are just," up to and including a dismissal of the plaintiff's complaint.[19]

In the case sub judice, there is ample evidence in the record to support the trial court's finding as to the lack of completeness and veracity in Mincey's deposition and discovery responses, and there-

---

[16] *See Herendeen*, 279 Ga. at 328; *Plunkett*, 217 Ga. App. at 22.

[17] Mincey includes as a separate enumeration of error the trial court's implicit overruling of her motion to exclude GDCA's expert witness because GDCA failed to timely provide her with the subject matter on which the expert is expected to testify and the substance of his testimony. *See* OCGA § 9-11-26 (e) (1) (B). This argument fails for the same reasons as those set forth in Division 2.

[18] *Level One Contact, Inc. v. BJL Enters., LLC*, 305 Ga. App. 78, 83 (4) (699 SE2d 89) (2010) (footnote omitted).

[19] *See Res. Life Ins. Co. v. Buckner*, 304 Ga. App. 719, 737 (4) (b) (698 SE2d 19) (2010) ("An interrogatory answer that falsely denies the existence of discoverable information is . . . worse than no response. When there is no response to an interrogatory or the response is devoid of content, the party serving the interrogatory at least knows that it has not received an answer." (citation and emphasis omitted)); *MARTA v. Doe*, 292 Ga. App. 532, 532 (664 SE2d 893) (2008) ("[F]or purposes of OCGA § 9-11-37 (d) sanctions, a defendant's intentional false response to a discovery request equates to a total failure to respond[.]").

fore, it was well within the trial court's discretion to reopen discovery to provide GDCA with an opportunity to fully explore the relevant aspects of its defense.[20]

*Judgment affirmed in part, reversed in part, and case remanded with direction. Barnes, P. J., and Blackwell, J., concur.*

DECIDED MARCH 24, 2011.

*Michael A. Baskin*, for appellant.

*Thurbert E. Baker, Attorney General, Bryon A. Thernes*, Assistant Attorney General, for appellee.

---

[20] *See generally* OCGA § 9-11-37 (a) (3), (b) (2) (A)-(C), (d); *Doe*, 292 Ga. App. at 537 (1) (affirming the trial court's order striking defendant's answer after concluding that defendant gave intentionally false responses to discovery requests); *Deep South Const., Inc. v. Slack*, 248 Ga. App. 183, 186 (2) (546 SE2d 302) (2001) (affirming the trial court's dismissal of plaintiff's action as a sanction for a failure to produce requested documents).