**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 3, 2014**

# In the Court of Appeals of Georgia

A14A0415. 915 INDIAN TRAIL, LLC v. STATE BANK AND
        TRUST COMPANY.

MCMILLIAN, Judge.

915 Indian Trail, LLC (the "LLC") appeals the trial court's order denying its

motion for summary judgment and granting summary judgment to State Bank and

Trust Company (the "Bank") in the Bank's suit to establish a priority lien under the

doctrine of equitable subrogation[1] on property located at 915 Indian Trail in Lilburn,

Georgia (the "Property"). We affirm for the reasons set forth below.

---

[1] Although the Bank styled its complaint as a quiet title action, that pleading
sought only a declaration that the Bank is the priority lienholder under the doctrine
of equitable subrogation and asserted no other basis to support a quiet title claim.
Moreover, the trial court's summary judgment order only addresses equitable
subrogation. Accordingly, we conclude that we have jurisdiction to consider this
appeal. See *Kim v. First Intercontinental Bank*, __ Ga. App. __, n. 1 (756 SE2d 655)
(2014); *Hayes v. EMC Mtg. Corp.*, 296 Ga. App. 709, 709, n. 2 (675 SE2d 594)
(2009). Compare *Byers v. McGuire Properties, Inc.*, 285 Ga. 530, 531 (679 SE2d 1)
(2009).

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. We review the grant of summary judgment de novo, construing the evidence in favor of the nonmovant." (Citation and punctuation omitted.) *Secured Realty Investments v. Bank of North Ga.*, 314 Ga. App. 628, 628 (725 SE2d 336) (2012).

Viewed in that light, the evidence shows that Aziz Dhanani is a principal in three of the corporations involved in the series of transactions in this case: the LLC, Premier Petroleum, Inc. ("Premier"), and Al-Madinah Petroleum, Inc. ("Al-Madinah"). Al-Madinah first purchased the Property, which contains a convenience store and gas station, in 1993 and sold it to Hasan S. Ahmed and Mohammad B. Hussain (collectively, the "Borrowers") on August 30, 2001, for around $750,000. On the same day, the Borrowers executed a deed to secure debt (the "BB&T lien") as security for a $694,500 loan from Branch Banking & Trust Company (the "BB&T loan").

Approximately six years later, on May 3, 2007, the Borrowers executed a second deed to secure debt in favor of Al-Madinah to secure payment of a $150,000 loan (the "Al-Madinah lien"). That deed, which was recorded on May 4, 2007, expressly provided that it was subordinate to the BB&T lien.

A few months later, the Borrowers sought to refinance the BB&T loan through Buckhead Community Bank ("BCB"). As a condition for the refinancing, BCB required cancellation of the Al-Madinah lien, and on December 3, 2007, Dhanani executed a "Satisfaction of Deed to Secure Debt"on behalf of Al-Madinah (the "Satisfaction"), which stated that Al-Madinah's $150,000 loan to the Borrowers had been "paid in full." However, the same day, unbeknownst to BCB, the Borrowers executed both a Promissory Note in the amount of $125,000 (the "Premier loan") and a security deed entitled "Second Deed to Secure Debt, Security Agreement and Assignment of Rents" in favor of Premier, another of Dhanani's corporations (the "Premier lien"). That deed also recited that it was subject to the terms of the BB&T lien. The Bank concedes that no evidence exists that Dhanani knew as of December 3, 2007, about the Borrowers' plans to refinance the BB&T loan through BCB.

The Premier lien was recorded the day of its execution, December 3, 2007, but it is undisputed that it was not indexed in the computerized statewide database of real property records until 10 p.m. on December 7, 2007. BCB's title examiner testified that the entry for the Premier lien may not have been available for review even at that time, because "many times" the noted times are incorrect and "there is a delay." Thus,

3

"in all likelihood," the Premier lien would not have been discoverable in a title examination until after December 7.

Meanwhile, on December 6, 2007, the Borrowers closed (the "Closing") on their refinancing with BCB (the "BCB loan"), and that loan was secured by a "Deed to Secure Debt and Security Agreement" signed by the Borrowers[2] in favor of BCB referencing a loan in the amount of $840,000 (the "BCB lien"). Of that amount, $621,746.03 was used to satisfy the BB&T loan. As a part of the Closing, the Borrowers executed an affidavit of ownership affirming that there were "no security deeds, mortgages or liens of any kind . . . affecting title to the Property" except as disclosed on an attached exhibit, which made no reference to the Premier lien. The BCB lien and other documents relating to the Closing, including the Satisfaction executed by Dhanani, were not recorded until December 19, 2007. The title insurance

---

[2] The record indicates, however, that two additional borrowers, Oshima Corporation ("Oshima") and Golden Convenience, Inc., d/b/a Shell Food Mart ("Golden"), may have been included on the underlying loan, and that these two parties also may have signed deeds to secure debt. Additionally, the record contains a "Deed to Secure Debt and Security Agreement" dated December 6, 2007 from Mairaj, Inc. ("Mairaj") in favor of BCB, which was intended to secure a guarantee given by Mairaj to BCB with regard to a loan in the amount of $840,000 made to the Borrowers, Oshima, and Golden and which was secured by a separate parcel of land. The parties have not pointed us to a record copy of any promissory note(s) for the BCB loan(s) underlying these deeds to secure debt, and we have found no copies of such notes in the appellate record.

4

policy obtained by BCB, also dated as of December 19, does not reflect the Premier lien, and no evidence exists that an additional title check was performed in the intervening 13 days between the Closing and the filing of the Closing documents. Additionally BB&T executed a satisfaction of the BB&T lien on December 24, 2007, but, inexplicably, that document was not recorded until almost one year later, on December 16, 2008.

Approximately one year after that filing, on December 4, 2009, the Federal Deposit Insurance Corporation was appointed as the receiver for BCB after it was closed by the Georgia Department of Banking and Finance. And on December 15, 2009, unbeknownst to the Bank, the Borrowers and Premier executed a "First Modification and Second Deed to Secure Debt, Security Agreement, and Assignment of Rents" (the "First Modification") in connection with the Premier lien, which purported to increase the amount of that lien to $935,000,[3] based on a separate supply agreement for petroleum products (the "Supply Agreement").[4]

_____

[3] The issue of whether the First Modification is valid and enforceable is not before us, and we expressly do not address it.

[4] On November 8, 2006, Dhanani's corporation, Premier, entered into the Supply Agreement with the Borrowers and Oshima Corporation under which Premier became the exclusive provider of petroleum products to the business located on the Property. The same day, the parties amended that contract to provide for

In or around October 2010, the BCB loan was assigned to the Bank, by which time the Borrowers were in default. The Bank chose to attempt to collect the debt first rather than immediately pursuing foreclosure. At some point, the Borrowers also defaulted on the Premier loan, and in February 2011, in anticipation of foreclosure, Premier conducted a title review, which gave it notice of the BCB lien. And on February 11, 2011, Premier filed the First Modification, reflecting the increased lien amount, in the county property records.

Premier advertised the pending foreclosure in February, and conducted a nonjudicial foreclosure sale on March 1, 2011, at which Premier made the successful bid of $350,000. On March 18, 2011, Premier executed a quitclaim deed conveying title to the Property to the LLC. Although Dhanani stated that the LLC was to pay Premier $350,000 for the Property, the LLC had made no payment as of the time of Dhanani's deposition in February 2013, and the quitclaim deed indicates that no

improvements to the business, and that amendment reflected that Premier had made a capital investment in the business of $810,000, although Dhanani explained that that figure reflected not only capital improvements to the Property, but also the future value of the Supply Agreement. The amended Supply Agreement was also expressly made subordinate to the BB&T lien. Additionally, in connection with the Supply Agreement, the parties filed a restrictive covenant, running with the land, stating that no petroleum products would be sold on the Property that were not purchased from Premier.

transfer tax was paid. The Bank did not learn of the Premier lien or the foreclosure until May or June 2011 when it conducted its own title search in anticipation of foreclosure, while at the same time pursuing a default judgment against the Borrowers.

On January 3, 2012, the Bank sent the LLC a letter stating that the Bank would be asserting a priority lien on the Property, and on August 14, 2012, the Bank filed this lawsuit. Subsequently, the trial court's summary judgment order granted the Bank a first priority lien to the Property, making it superior to the LLC's claims. This appeal followed.

1. The LLC asserts that the trial court erred in granting summary judgment to the Bank on its equitable subrogation claim because the Bank was guilty of culpable or inexcusable neglect and the superior or equal equity of the LLC and others will be prejudiced.

"In substance, the principle [of equitable subrogation] provides that in certain circumstances, a lender who pays off the lien of a senior creditor may step into the shoes of the senior creditor as to the priority of the senior creditor's lien." *Greer v. The Provident Bank, Inc.*, 282 Ga. App. 566, 568 (639 SE2d 377) (2006). As the Supreme Court of Georgia has often explained,

[w]here one advances money to pay off an encumbrance on realty either at the instance of the owner of the property or the holder of the encumbrance, either upon the express understanding or under circumstances under which an understanding will be implied that the advance made is to be secured by the senior lien on the property, in the event the new security is for any reason not a first lien on the property, the holder of the security, if not chargeable with culpable or inexcusable neglect, will be subrogated to the rights of the prior encumbrancer under the security held by him, unless the superior or equal equity of others would be prejudiced thereby; knowledge of the existence of an intervening encumbrance will not alone prevent the person advancing the money to pay off the senior encumbrance from claiming the right of subrogation where the exercise of such right will not in any substantial way prejudice the rights of the intervening encumbrancer . . . .

(Citations and footnote omitted.) *Davis v. Johnson*, 241 Ga. 436, 438 (246 SE2d 297) (1978). "The typical remedy is that equity will set aside a cancellation of the original security and revive it for the benefit of the party who paid it off." (Citation and punctuation omitted.) *Secured Equity Financial, LLC v. Washington Mut. Bank, F.A.*, 293 Ga. App. 50, 53 (666 SE2d 554) (2008). Additionally, we note that the "basis [of subrogation] is the doing of complete, essential, and perfect justice between all the parties, without regard to form, and its object is the prevention of injustice. The courts

8

incline rather to extend than restrict the principle." (Citation and punctuation omitted.) *Davis*, 241 Ga. at 439.

Here, as the Premier lien expressly acknowledged, the BB&T lien held the position of senior lienholder at the time the Premier lien was filed and retained that position until such time as it was satisfied as of record. A portion of the proceeds of the BCB loan was used to pay off the BB&T loan in full. Thus, the Bank, as the assignee of the BCB loan, meets the prima facie requirement for establishing the right to equitable subrogation. *Hayes v. EMC Mtg. Corp.*, 296 Ga. App. 709, 711 (675 SE2d 594) (2009). And "if [the Bank] can show that it was not guilty of culpable or inexcusable neglect, that the superior or equal equity of others would not be prejudiced, and that exercise of the right of subrogation will not in any substantial way prejudice [the LLC's] rights, then the [BCB] lien may be subrogated to the rights of the [BB&T lien]." *Greer*, 282 Ga. App. at 569.

(a) *Culpable or Inexcusable Neglect*. This Court has previously defined inexcusable neglect [i]n this context . . . as the plaintiff's failure to avail itself of the proper legal remedy when it had the chance." (Citation and punctuation omitted.) *Secured Equity*, 293 Ga. App. at 530 (a). The LLC asserts that the Bank was guilty of inexcusable neglect because it was on constructive notice of the Premier lien at the

Closing; it failed to conduct a post-Closing title search, which would have disclosed the Premier lien; it failed to conduct a title search in October 2010 when it learned the BCB loan was in default, although it was industry practice to do so; and it was on constructive notice of the foreclosure via publication yet failed to assert its rights at that time.

It is undisputed that neither BCB nor the assignee Bank had actual notice of the Premier lien and/or the foreclosure at any time prior to May or June 2011. Thus, these entities had a reasonable basis for believing that the BCB lien held first priority on the Property. Nevertheless, they had constructive notice of the lien based on the December 3, 2007 filing. Similarly, the publication of the foreclosure notices in February 2011 provided constructive notice of the Premier lien. However, constructive notice is not necessarily fatal to a claim of equitable subrogation. "Knowledge of the existence of an intervening encumbrance will not alone prevent the person advancing the money to pay off the senior encumbrance from claiming the right of subrogation where the exercise of such right will not in any substantial way prejudice the rights of the intervening encumbrancer." (Citation omitted.) *Citifinancial Svcs. , Inc. v. Varner*, 320 Ga. App. 170, 174 (739 SE2d 477) (2013).

See also *Baxter v. Bayview Loan Servicing*, 301 Ga. App. 577, 587 (688 SE2d 363) (2009).

Moreover, although the LLC argues that BCB, and later the Bank, could have discovered the lien at various earlier points in time, it has not cited any law demonstrating that, as a prerequisite to equitable subrogation, BCB had a duty to conduct a post-closing title exam or that either entity had a duty to monitor the deed records after Closing, even at the time of the Borrowers' default,[5] and we have found none. See *Secured Equity*, 293 Ga. App. at 54 (a).

Accordingly, we agree with the trial court that the evidence presents no issue of fact as to inexcusable neglect on the part of the Bank.

(b) *Prejudice*. In arguing that the exercise of equitable subrogation will result in prejudice, the LLC argues that based upon BCB's and the Bank's inaction with regard to the Property, Premier expended substantial expense to initiate foreclosure procedures. The LLC also notes that on April 1, 2011, it entered into a Lease and

---

[5] Even though the Bank's representative testified that it was customary to conduct a title review upon the default of a substantial loan, he did not indicate whether the BCB loan fell within his definition of a "substantial" loan. And he later clarified that industry practice required only that the review be performed before foreclosure. In any event, the LLC failed to cite any law establishing that any such practice would preclude a claim for equitable subrogation.

11

Management Agreement with third parties to operate the gas station and convenience store,[6] and argues that both the LLC and the third parties would be injured if the Bank foreclosed and evicted the third-party tenant.

But the prejudice required to estop a party from asserting a right to subrogation must be more than merely incurring the expenses of levy or foreclosure, although under equitable principles the party receiving the benefit of subrogation may have to reimburse such expenses. *Davis*, 241 Ga. at 440. Estoppel may be appropriate, however, where "the intervening lienholder has taken or purchased the lien in reliance upon his apparent status as senior lienor." Id. But Premier took its lien with full knowledge that it would not be the senior lienholder. The underlying deed was entitled a "Second Deed to Secure Debt," and Dhanani testified that he understood that Premier was second in priority to the BB&T lien. Under these circumstances, "[w]e cannot say that [the Bank's] exercise of the right of subrogation would prejudice [Premier's or the LLC's] rights where, as here, [the Premier lien] remains second in order of priority, after the amount secured by the [BB&T] loan." (Citation

---

[6] The original agreement reflects that Premier entered into the management agreement, although Premier had quitclaimed its interest in the Property to the LLC one month earlier. At some point, the parties signed an undated amendment substituting the LLC for Premier as a party to that management agreement.

12

and punctuation omitted.) *Baxter*, 301 Ga. App. at 588 (c). "At the time [Premier] recorded its security deed, [the senior BB&T lien] was still of record[, and the Premier lien was made expressly subject to that lien]. Therefore, in no legally cognizable sense will [Premier] be prejudiced by equitable subrogation in favor of [the Bank]." *Byers*, 285 Ga. at 539 (4). See also *Davis*, 241 Ga. at 440.

Similarly, although the LLC is the current titleholder to the Property, Dhanani testified that it was created just "to hold real estate title" to the Property, and the LLC paid nothing in the transaction. Dhanani is a principal in both corporations, and thus any knowledge on the part of Premier as to the Premier lien's status must be imputed to the LLC. See generally *Clarence L. Martin, P.C. v. Chatham County Tax Commr.*, 258 Ga. App. 349, 350 (574 SE2d 407) (2002) ("A corporation is bound by knowledge of an officer or agent when the knowledge pertains to matters within the scope of the officer's or agent's duties.") (citation omitted). And although the LLC asserts that under the management agreement, the third-party tenant and it have incurred substantial expense, it points to no evidence in the record to support these assertions.[7] Accordingly, we can only guess as to any actions the parties may or may

---

[7] Dhanani testified only that *Premier* had received no revenue from the agreement.

13

not have taken under that agreement, and "summary judgment cannot be avoided based on mere speculation or conjecture." (Citations omitted.) *Stevenson v. City of Doraville*, 294 Ga. 220, 224 (2) (751 SE2d 845) (2013). Under these circumstances, we cannot say that the record contains evidence sufficient to create an issue of fact as to whether the rights of the LLC or the third parties would be prejudiced by the exercise of equitable subrogation.

Accordingly, "[u]nder the doctrine of equitable subrogation, . . . we find that even if [BCB] took its security deed with [constructive] notice of [Premier's] lien against the Property, [the Bank, as BCB's assignee] has a first priority security interest in the Property in the amount of [$621,746.03, plus interest accruing at the terms set forth under the BB&T Loan]," as the trial court found. *Bayview*, 301 Ga. App. at 588 (1).

2. Nevertheless, the LLC asserts that the Bank should be estopped from asserting its claim for equitable subrogation because it is guilty of laches by waiting over 17 months after the foreclosure before bringing suit. In support of this defense, the LLC raises a number of the same arguments discussed in Division 2 above, in connection with its claims of inexcusable neglect and prejudice.

14

"To establish the affirmative defense of laches, the [LLC was] required to come forward with evidence showing inexcusable delay and prejudice resulting therefrom." *Harvey v. Bank One, N.A.*, 290 Ga. App. 55, 58 (2) (658 SE2d 824) (2008). And to obtain summary judgment on this ground, the LLC had the burden "to come forward with evidence demonstrating as a matter of law" that the Bank was guilty of laches. *Cleaveland v. Gannon*, 284 Ga. 376, 381 (2) (667 SE2d 366) (2008) (addressing defendant's burden as to affirmative defense under statute of limitation).

Although the LLC is correct that the complaint was not filed until 17 months after the foreclosure, as discussed in Division 2 above, the Bank was unaware of the Premier lien until several months after the foreclosure, and the record demonstrates that the Bank did not sit on its rights in the interim. Rather, it initiated collection proceedings against the Borrowers, filing suit within two months of being assigned the loan and obtaining a default judgment approximately six months after that. The Bank then explored foreclosure, and, upon learning of the Premier lien, began exerting its right to equitable subrogation approximately six months later and initiated this action eight months after that. We cannot say that this lapse of time constituted an inexcusable delay under the circumstances. In any event, "[t]he mere lapse of time is insufficient to establish the affirmative defense of laches." *Harvey*, 290 Ga. App.

15

at 58 (2). The LLC also was required to prove prejudice resulting from the delay. And as we have found that the LLC failed to provide evidence of any resulting prejudice from the Bank's assertion of its rights to equitable subrogation, we also find that the LLC failed to carry its burden of establishing that the Bank was guilty of laches.

3. The LLC asserts that the trial court erred in failing to order the Bank to produce its Loan Policy and Procedures Manual prior to issuing a ruling on the cross-motions for summary judgment, or, in the alternative, in failing to construe the evidence of this manual against the Bank.

"In matters involving discovery disputes, trial judges have broad discretion in controlling discovery, including the imposition of sanctions, and this Court will not reverse a trial court's decision on such matters unless there has been a clear abuse of discretion." (Citation and punctuation omitted.) *Mincey v. Ga. Dept. of Community Affairs*, 308 Ga. App. 740, 747 (2) (708 SE2d 644) (2011). See also *Triple Net Properties, LLC v. Burruss Dev. & Constr., Inc.*, 293 Ga. App. 323, 326 (1) (667 SE2d 127) (2008) (denial of continuance of summary judgment proceedings within trial court's discretion and appellate court will not interfere absent clear abuse).

On March 1, 2013, thirty days before the six-month discovery period expired, the LLC served the Bank with interrogatories and a request to produce pursuant to

16

OCGA § 9-11-34, seeking, inter alia, production of *all* of the Bank's policy and procedures manuals over a three-year period (the "Manuals"). The Bank provided no response to this discovery, but on April 26, 2013, filed its motion for summary judgment. The LLC filed its own cross-motion for summary judgment on May 1, 2013,[8] and its brief opposing the Bank's motion on May 29, 2013, with no mention of the outstanding discovery requests.

The summary judgment hearing ultimately was scheduled for July 30, 2013, and on July 25, the Thursday before that hearing, the LLC re-sent a copy of its March 1, 2013 discovery and served a separate Notice to Produce pursuant to OCGA § 24-13-27, by e-mail and overnight delivery. The notice requested that the Bank produce the Manuals the following Monday, the morning before the motion hearing.

Although the Bank apparently produced a number of documents in response to the notice, it did not produce the Manuals, and the LLC's counsel raised this issue at the hearing. Explaining that he thought the Manuals "may be important" to the LLC, he asked that the trial court reserve ruling on the summary judgment motions until the Manuals were produced and the LLC had the opportunity to file a

---

[8] The LLC's motion raised the issues of equitable subrogation, inexcusable neglect, prejudice, and laches.

17

supplemental brief "if appropriate." The Bank objected to the LLC's request, noting first that it was unaware of the March discovery request, that a notice to produce was not the proper vehicle for a summary judgment hearing, and asserting that the request for the Manuals was overly broad. The trial court noted that the only matters on the calendar were the two summary judgment motions and declined to rule on the LLC's oral motion at that time.

After the hearing, on August 9, 2013, the LLC filed a motion to compel pursuant to OCGA §§ 9-11-37 (a) and 24-13-26, narrowing its focus to the production of the Bank's "Loan Policy and Procedures Manuals." Twenty days later, on August 29, 2013, the trial court issued its summary judgment order without addressing the LLC's motion to compel. We find no abuse of discretion.

Under OCGA § 9-11-56 (a), a plaintiff may move for summary judgment "at any time." "Thus, it is not unusual for discovery to be ongoing at the time summary judgment motions are filed and/or ruled upon." *Corry v. Robinson*, 207 Ga. App. 167, 170 (3) (427 SE2d 507) (1993). But when a party is "faced with a motion for summary judgment and the unavailability of evidence to rebut such motion," a party must seek relief under OCGA § 9-11-56 (f). *NationsBank, N.A. v. SouthTrust Bank of Ga., N.A.*, 226 Ga. App. 888, 895 (2) (487 SE2d 701) (1997) (physical precedent

18

only). See also *Thompson v. Tom Harvey Ford Mercury*, 193 Ga. App. 64 (387 SE2d 28) (1989). That statute provides that

> [s]hould it appear from the affidavits of a party opposing the motion that he cannot, for reasons stated, present by affidavits facts essential to justify his opposition, the court may refuse the application for judgment, or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had, or may make such other order as is just.

OCGA § 9-11-56 (f). The LLC never filed a 9-11-56 (f) motion to allow additional time for discovery.

However, even if we construe the LLC's oral request at the hearing and his post-hearing motion to compel as a request under OCGA § 9-11-56 (f), we find that the LLC failed to establish a basis to delay the ruling on summary judgment. The statute requires that a party seeking relief set forth in an *affidavit* that it "cannot, for reasons stated, present by affidavits facts essential to justify [its] opposition" to a motion for summary judgment. Thus, the LLC was required "to set forth the reasons for a continuance and to show that if the motion to compel were successful, then what relevant and material evidence would be produced in opposition to the motion for summary judgment." *NationsBank*, 226 Ga. App. at 896 (2). The only affidavit filed

19

in support of the LLC's motion addressed the time line of the discovery and the LLC's counsel's good faith attempt to resolve the discovery issue, but the affidavit fails "[to] demonstrate that a continuance would lead to the discovery of relevant evidence," as required by the statute. *JarAllah v. Schoen*, 243 Ga. App. 402, 406 (4) (531 SE2d 778) (2000). Accordingly, the LLC's affidavit did not adequately support the company's request to delay the trial court's ruling on summary judgment, and its argument to the trial court provided no additional support.

In addition, at the summary judgment hearing, the LLC argued only that the Manuals "may be important," and its post-hearing motion asserts only that whether the Bank, in fact, complied with its own procedures "may shed light" on whether "it was not guilty of culpable or inexcusable neglect" without further explanation. The LLC failed to point to any authority either on appeal or in the trial court establishing how the Bank's own internal standards are relevant to the issues of equitable subrogation or laches in this case, and we have found none.

The cases upon which the LLC relies are distinguishable. The LLC is correct that those cases cite "a general rule [that] this Court does not condone the grant of summary judgment while a motion to compel discovery is pending, *unless it can be determined that the disallowed discovery would add nothing of substance to the*

20

*party's claim.*" (Citation and punctuation omitted; emphasis supplied.) *Dodson v.*

*Sykes Indus. Holdings, LLC*, 324 Ga. App. 871, 875-876 (1) (752 SE2d 45) (2013).

In each of the cases cited by the LLC, it appears the parties argued the relevance and

materiality of the evidence they sought in discovery before the trial court. See id.;

*Parks v. Hyundai Motor America*, 258 Ga. App. 876, 877-880 (1) (575 SE2d 673)

(2002); *McCall v. Henry Med. Ctr., Inc.*, 250 Ga. App. 679, 685 (551 SE2d 739)

(2001) (motion to defer summary judgment under OCGA § 9-11-56 (f) should have

been granted because party demonstrated that if she succeeded on her motion to

compel, it could result in evidence that could add substance to her case). But where,

as here, it appears that the requested discovery would add nothing of substance to the

case, we cannot say that the trial court clearly abused its discretion in failing to delay

its order on summary judgment until it ruled on the LLC's motion to compel. See

*Gilco Investments, Inc. v. Stafford Cordele, LLC*, 267 Ga. App. 167, 169 (1) (598

SE2d 889) (2004).[9]

---

[9] The LLC's filing of a notice to produce under OCGA § 24-13-27 in connection with the summary judgment hearing does not alter our analysis. Pretermitting whether a notice to produce is a proper discovery vehicle at a non-evidentiary hearing, nothing about such a notice compels the granting of the LLC's request to defer summary judgment in this case. Notices to produce are enforceable under OCGA § 24-13-26, the statute for enforcing subpoenas. OCGA § 24-13-27. And although subsection (b) of that statute states that a trial "court may also in

21

*Judgment affirmed. Phipps, C. J., concurs. Ellington, P. J., concurs in judgment only*.

---

appropriate proceedings grant continuance of the proceeding," the granting of such a continuance also lies within the trial court's discretion. See *Barker v. Barker*, 233 Ga. 170, 170 (2) (210 SE2d 705) (1974).