**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 23, 2017**

# In the Court of Appeals of Georgia

A17A0002. HOSPITAL AUTHORITY OF VALDOSTA/LOWNDES COUNTY d/b/a SOUTH GEORGIA MEDICAL CENTER et al. v. FENDER et al.

A17A0003. SPELL et al. v. FENDER et al.

McMillian, Judge.

Dennis H. Fender and Penny B. Fender brought this medical malpractice action against Hospital Authority of Valdosta/Lowndes County d/b/a South Georgia Medical Center ("SGMC"), Melissa Brackin, Dr. Andrew Spell, and Radiology Associates of Valdosta, LLC ("Radiology Associates"), alleging that the negligent performance and interpretation of a carotid artery ultrasound study resulted in Mr. Fender suffering a massive stroke and permanent brain damage. After the trial court denied the defendants' motions for summary judgment and to exclude the opinion testimony of one of the plaintiffs' medical experts, the trial court issued certificates of immediate

review, and the defendants filed applications for interlocutory appeal, which we granted. These companion appeals followed.

In Case No. A17A0002, SGMC and Brackin (collectively, the "Hospital Defendants") contend that the trial court erred in denying their motions for summary judgment because the plaintiffs' claims were barred by the applicable two-year statute of limitation and the plaintiffs failed to prove causation. Additionally, SGMC contends that the trial court erred in denying its motion for summary judgment on the plaintiffs' claims for negligent hiring, training, supervision, and retention. In Case No. A17A0003, Dr. Spell and Radiology Associates (collectively, the "Radiology Defendants") contend that the trial court erred in denying their motion for summary judgment because the plaintiffs' claims were barred by the statute of limitation and in denying their motion to exclude certain expert opinion testimony.

For the reasons discussed below, we conclude that the trial court erred in denying SGMC's motion for summary judgment on the plaintiffs' claims against it for the negligent hiring, training, supervision, and retention of Brackin. Accordingly, in Case No. A17A0002, we reverse the trial court's denial of summary judgment to SGMC on the plaintiffs' claims for negligent hiring, training, supervision, and

2

retention, and we remand for the entry of summary judgment in favor of SGMC on those claims. We affirm in all other respects in both appeals.

*Case No. A17A0002*

1. The Hospital Defendants argue that the trial court erred in denying their motions for summary judgment on the statute of limitation and causation. Summary judgment is appropriate only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). On appeal from the trial court's denial of summary judgment, "we review the evidence de novo, and all reasonable conclusions and inferences drawn from the evidence are construed in the light most favorable to the nonmovant." (Citation, punctuation, and footnote omitted.) *MCG Health v. Barton*, 285 Ga. App. 577, 578 (647 SE2d 81) (2007). "We do not resolve disputed facts, reconcile the issues, weigh the evidence, or determine its credibility, as those matters must be submitted to a jury for resolution." *Tookes v. Murray*, 297 Ga. App. 765, 766 (678 SE2d 209) (2009). Guided by these principles, we turn to the factual and procedural background in the present case before addressing the Hospital Defendants' specific arguments.

*May 18, 2009.* The record reflects that on May 18, 2009, Mrs. Fender drove Mr. Fender to the emergency room at SGMC after he woke up with disorientation, a headache, dizziness, extremely high blood pressure, and blurred vision. In the emergency room, Mr. Fender's blurred vision progressed to a loss of peripheral vision in his left eye. At the time he presented to the emergency room with these symptoms, Mr. Fender was 53 years old and had several risk factors for stroke, including a history of high blood pressure and high cholesterol and the fact that he was a smoker. He also had a family history of stroke.

Mr. Fender was admitted to the hospital, where he underwent an ultrasound of his carotid arteries, the vessels in the neck that supply blood to the face and brain. A carotid ultrasound is a diagnostic imaging tool used to evaluate carotid arteries for narrowing, or stenosis, caused by plaque. An ultrasound technician called a sonographer performs the imaging and takes the blood flow velocity measurements, which are then provided to a radiologist or other physician who interprets them.

Mr. Fender's ultrasound study was performed by Brackin, a sonographer employed by SGMC, who then sent her documentation to Dr. Spell, the hospital's on-call radiologist who practiced with Radiology Associates. Dr. Spell interpreted the ultrasound study and concluded that Mr. Fender had mild narrowing in his left

4

internal carotid artery from the plaque, but no significant stenosis. Dr. Spell believed that the ultrasound study had been performed correctly and that no further imaging or testing was necessary to evaluate the extent of the narrowing in Mr. Fender's carotid artery. Dr. Spell's ultrasound report was provided to the hospital clinicians involved in making Mr. Fender's treatment decisions.

Following Dr. Spell's interpretation of the ultrasound study as showing no significant stenosis, Mr. and Mrs. Fender were told that the results of the ultrasound study were "normal" and that Mr. Fender's symptoms were the result of a "hypertensive crisis." Mr. Fender was discharged from the hospital on May 19 and told to follow up with his primary care physician and with an ophthalmologist. Mr. Fender carried on with his life as before the May 2009 incident, pursuing his usual occupation of driving a tractor-trailer rig.

A week after Mr. Fender was discharged from the hospital, Mr. and Mrs. Fender visited their primary care physician, who informed them that Mr. Fender had suffered a transient ischemic attack ("TIA"), which causes temporary symptoms that can resemble the symptoms of a stroke. See Mayo Clinic Staff, Definition of Transient Ischemic Attack (TIA), The Mayo Clinic, http://www.mayoclinic.com/health/conditions/transient-ischemic-attack/

symptoms-causes/dxc-20314622 (last visited June 20, 2017). Mr. Fender's physician counseled him to stop smoking and to continue his medication for high blood pressure and high cholesterol. No additional ultrasounds or other testing were ordered.

In addition to seeing his primary care physician, Mr. Fender saw an ophthalmologist approximately two weeks after his discharge from the hospital. A medical record from the ophthalmologist visit stated that Mr. Fender complained of continued vision problems in his left eye. However, Mrs. Fender testified that Mr. Fender had stopped complaining of any symptoms from the May 2009 incident, including any vision problems in his left eye, by the time he was discharged from the hospital and that, to her knowledge, Mr. Fender went a period of time without any symptoms.

*April 7, 2010.* On April 7, 2010, Mr. Fender suddenly collapsed at his home. Mr. Fender was unable to move or speak and did not recognize his family. Mrs. Fender called 911, and an ambulance transported Mr. Fender to the hospital, where he was diagnosed with having suffered a massive stroke. Ultrasound imaging showed a complete obstruction of his left internal carotid artery in the same location as the

plaque shown in the May 2009 ultrasound. Additional testing showed that the stroke had caused extensive brain damage.

*The Medical Malpractice Action.* Mr. and Mrs. Fender commenced the present action against the defendants on April 2, 2012, less than two years after his 2010 stroke, seeking damages for medical malpractice and loss of consortium. The plaintiffs alleged that Brackin had negligently performed the carotid ultrasound study of Mr. Fender on May 18, 2009 by failing to recognize significant stenosis in his left internal carotid artery caused by a large plaque formation, failing to properly measure velocities in the area of the stenosis, and failing to reproduce all appropriate images during the ultrasound. The plaintiffs further alleged that Dr. Spell had negligently interpreted the May 2009 ultrasound study by failing to recognize, document, and diagnose the significant visible stenosis in Mr. Fender's left internal carotid artery caused by the large plaque formation, and by failing to recognize inaccuracies in the ultrasound study that necessitated further imaging and measurements. According to the plaintiffs, if the ultrasound study had been properly performed by Brackin and evaluated by Dr. Spell, Mr. Fender would have been diagnosed with significant stenosis and would have undergone surgical intervention to address the extensive

7

plaque buildup in his left internal carotid artery, such that his stroke in April 2010 caused by the plaque would have been avoided.

In addition to Brackin and Dr. Spell, the plaintiffs sought to recover against SGMC and Radiology Associates under the doctrine of respondeat superior. The plaintiffs also sought to recover against SGMC on the basis that it was negligent in hiring, training, supervising, and retaining Brackin. The plaintiffs sought compensatory damages, but not punitive damages.

The defendants answered, denying liability, and raised several affirmative defenses, including that the plaintiffs' claims were barred by the applicable two-year statute of limitation. Following discovery, the defendants moved for summary judgment on the grounds that the plaintiffs had failed to present sufficient evidence to establish the causation element of their claims. Additionally, SGMC moved for summary judgment on the plaintiffs' claims for the negligent hiring, training, supervision, and retention of Brackin, contending that the plaintiffs were limited to pursuing a claim against SGMC based on respondeat superior. The defendants also filed motions to exclude the opinion testimony of Dr. Avery J. Evans, an interventional neuroradiologist retained as an expert by the plaintiffs. The defendants later filed supplemental motions for summary judgment asserting that the plaintiffs'

claims were barred by the two-year statute of limitation for medical malpractice claims.

After conducting a hearing, the trial court entered its order denying the defendants' motions for summary judgment and for the exclusion of Dr. Evans' expert opinion testimony. The trial court certified its order for immediate review, and the defendants filed applications for interlocutory appeal, which this Court granted, resulting in these companion appeals.

(a) The Hospital Defendants first contend that the trial court erred in denying their supplemental motion for summary judgment because the uncontroverted evidence showed that the plaintiffs' claims were barred by the two-year statute of limitation found in OCGA § 9-3-71 (a). According to the Hospital Defendants, the plaintiffs' claims accrued on May 18, 2009, when Mr. Fender was injured by allegedly being misdiagnosed as having no significant stenosis in his left internal carotid artery, and therefore the plaintiffs were required to bring their suit within two years of that date, which they failed to do. We are unpersuaded because a genuine issue of material fact exists as to whether Mr. Fender suffered a new injury on April 7, 2010, and the plaintiffs filed their action within two years of that date.

9

The statute of limitation for medical malpractice actions is set forth in OCGA § 9-3-71 (a), which provides, in pertinent part, that "an action for medical malpractice shall be brought within two years after the date on which an injury or death arising from a negligent or wrongful act or omission occurred."[1]

> Generally, in malpractice cases involving a misdiagnosis that resulted in a failure to properly treat a condition, the "injury" referred to in OCGA § 9-3-71 (a) occurs at the time of the misdiagnosis. This is because the patient usually continues to experience pain, suffering, or economic loss from the time of the misdiagnosis until the medical problem is properly diagnosed and treated. Under these circumstances, the misdiagnosis itself is the injury and not the subsequent discovery of the proper diagnosis. Therefore, the limitation period usually runs from the date of the misdiagnosis.

(Citations and punctuation omitted.) *Ward v. Bergen*, 277 Ga. App. 256, 258 (626 SE2d 224) (2006). See *Kaminer v. Canas*, 282 Ga. 830, 831-832 (1) (653 SE2d 691) (2007).

The proposition that the limitation period imposed by OCGA § 9-3-71 (a) runs from the date of the misdiagnosis, however, "is only *generally* true." (Emphasis in

---

[1] Similarly, "plaintiffs bringing loss of consortium actions which arise out of medical malpractice have only two years in which to file their claims." (Punctuation and footnote omitted.) *Beamon v. Mahadevan*, 329 Ga. App. 685, 688 (2) (766 SE2d 98) (2014).

original.) *Sidlow v. Lewis*, 271 Ga. App. 112, 116 (2) (608 SE2d 703) (2004). Georgia courts recognize a limited exception to that general proposition "in cases where a misdiagnosis and failure to provide proper treatment results in the development of a new and different injury than that which existed at the time of the misdiagnosis." *Ward*, 277 Ga. App. at 258. In cases where the new injury exception applies, the limitation period begins to run from the date the symptoms attributable to the new injury first manifest. *Cleaveland v. Gannon*, 284 Ga. 376, 383 (3) (667 SE2d 366) (2008); *Amu v. Barnes*, 283 Ga. 549, 553 (662 SE2d 113) (2008). "In order for this exception to apply, not only must there be evidence that the patient developed a new injury, but he or she also must remain asymptomatic for a period of time following the misdiagnosis." (Citations and punctuation omitted.) *Amu*, 283 Ga. at 552. And in addressing these questions, we are mindful that the statute of limitation defense is an affirmative defense under OCGA § 9-11-8 (c), and thus the burden of proof was on the Hospital Defendants to show that the statute bars the plaintiffs' claims. *Brown v. Coast Dental of Ga.*, 275 Ga. App. 761, 767 (1) (622 SE2d 34) (2005).

In the present case, it is undisputed that Mr. Fender suffered a new and massive stroke in April 2010, so the issue turns on whether Mr. Fender remained asymptomatic for a period of time following the misdiagnosis. Mrs. Fender testified

11

that Mr. Fender stopped complaining of any symptoms from the May 2009 incident by the time he was discharged from the hospital after his alleged misdiagnosis and that, to her knowledge, Mr. Fender had experienced a period of time without any symptoms before his massive stroke in April 2010. While other evidence, such as the previously discussed medical record from Mr. Fender's June 2009 ophthalmologist appointment, reflect that Mr. Fender may have had some residual symptoms, this "case is on summary judgment, and the evidence must be construed most favorably for [the plaintiffs]." *Cleaveland*, 284 Ga. at 382 (2). Consequently, when the plaintiffs are given "the benefit of all reasonable doubts" and "the evidence and all inferences and conclusions therefrom" are construed in their favor, there was evidence that Mr. Fender experienced an asymptomatic period between his alleged misdiagnosis in May 2009 and his stroke in April 2010. (Citation and punctuation omitted.) *Brown*, 275 Ga. App. at 768 (1). See also *Cleaveland*, 284 Ga. at 384 (Melton, J., concurring) ("critical factual determination" for determining whether the "new injury" exception applies is whether the patient experienced an asymptomatic period between the initial diagnosis and the onset of new symptoms.)

For these reasons, the trial court did not err in determining that there was evidence that Mr. Fender incurred a new injury when he suffered a massive stroke

12

and permanent brain damage on April 7, 2010, and in concluding that the two-year limitation period could begin to run on that date, which would render the plaintiffs' malpractice action timely. The trial court thus committed no error in denying the Hospital Defendants' supplemental motion for summary judgment based on the statute of limitation.

(b) The Hospital Defendants argue the trial court erred in denying their motion for summary judgment because the plaintiffs failed to establish the causation element of their medical malpractice claims. According to the Hospital Defendants, the plaintiffs failed to show that Mr. Fender's April 2010 stroke could have been avoided, if Brackin had performed the ultrasound study differently. We disagree.

To establish a claim for medical malpractice, a plaintiff must prove that the defendant's negligence in the diagnosis and treatment of the plaintiff was the actual and proximate cause of the injuries he sustained. *King v. Zakaria*, 280 Ga. App. 570, 575 (2) (b) (634 SE2d 444) (2006). See *Zwiren v. Thompson*, 276 Ga. 498, 499-500 (578 SE2d 862) (2003); *Walker v. Giles*, 276 Ga. App. 632, 638 (624 SE2d 191) (2005). The causation element requires the plaintiff to establish to a reasonable degree of medical certainty that the injury to the plaintiff would have been avoided

in the absence of the alleged medical negligence. *Anthony v. Chambless*, 231 Ga. App. 657, 659 (1) (500 SE2d 402) (1998).

Causation in a medical malpractice case must be proven through expert testimony "because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." *Zwiren*, 276 Ga. at 500. However, "Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty." Id. at 503. Moreover, "[c]ausation may be established by linking the testimony of several different experts" and "must be determined in light of the evidentiary record as a whole." *Walker*, 276 Ga. App. at 642 (1). And "[q]uestions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." (Punctuation and footnote omitted.) *Moore v. Singh*, 326 Ga. App. 805, 809 (1) (755 SE2d 319) (2014).

In the present case, the plaintiffs' medical experts opined that at the time of the May 2009 ultrasound study conducted by Brackin, it was more likely than not, to a reasonable degree of medical certainty, that Mr. Fender had significant stenosis in his left internal carotid artery that exceeded 50 percent and elevated velocities in the area

14

of the stenosis. Specifically, Dr. Stone, a cardiovascular surgeon retained by the plaintiffs as an expert, opined that Brackin had violated the standard of care by failing to sufficiently describe and measure the degree of the stenosis, and by failing to take several velocity measurements in the area of the stenosis.

In addition, Dr. Evans, a neuroradiologist retained by the plaintiffs, opined that Brackin violated the standard of care by failing to recognize the significant degree of the stenosis in Mr. Fender's artery and failing to take velocity measurements at that location. Dr. Evans further opined that Brackin violated the standard of care by taking a velocity measurement purportedly in the area of the stenosis that in fact was taken in a different area, and by providing documentation to Dr. Spell, the radiologist, that inaccurately measured the blood flow velocity and degree of the stenosis.

Dr. Evans also opined that Brackin's erroneous documentation "suggested wrongly that the patient did not have a significant stenosis," and that if a stenosis of greater than 50 percent had been properly identified in this case, it would have most likely resulted in surgical intervention to correct the stenosis before Mr. Fender's massive stroke, given Mr. Fender's other risk factors and his family history of stroke. Consequently, Dr. Evans opined, Brackin's erroneous ultrasound study resulted in Mr. Fender's massive stroke in April 2010 to a high degree of medical certainty.

15

In light of this combined expert testimony, we cannot say that the plaintiffs failed to come forward with sufficient evidence of causation. To the extent that any of the plaintiffs' experts gave other, conflicting testimony on the issue of causation, such contradictions go only to the credibility of the experts and are for the jury to resolve. See *Moore*, 326 Ga. App. at 811 (2); *Aleman v. Sugarloaf Dialysis, LLC*, 312 Ga. App. 658, 662 (2) (719 SE2d 551) (2011). The evidence regarding causation was not so "clear, plain, palpable and undisputed" as to demand the entry of summary judgment in favor of the Hospital Defendants. *Moore*, 326 Ga. App. at 809 (1).

The Hospital Defendants nevertheless argue that the testimony of the plaintiffs' medical experts is insufficient to establish causation because Dr. Spell testified that he was satisfied with Brackin's ultrasound study and would not have diagnosed Mr. Fender with significant stenosis in the absence of stenosis greater than 70 percent and a blood flow velocity of greater than 230 centimeters per second. However, Dr. Spell's testimony on the issue is not dispositive, given that the plaintiffs' experts also testified that Dr. Spell violated the standard of care in this case by failing to identify the significant degree of stenosis reflected in the grayscale ultrasound images and failing to order further testing in light of Brackin's clearly deficient ultrasound study. Furthermore, Dr. Spell testified that he did not make treatment decisions, but simply

16

passed on his radiological results to a qualified clinician, and the plaintiffs' experts opined that if the properly identified degree of stenosis of greater than 50 percent had been identified by Brackin and Dr. Spell, it most likely would have led to successful surgical intervention under the circumstances of this case before Mr. Fender suffered the massive stroke. Given this combined testimony, a jury would be entitled to find that Brackin's negligence in performing the ultrasound study was "a link in the chain of incorrect decisions made with regard to [Mr. Fender's] treatment" and that her negligence, combined with Dr. Spell's negligence, led to the catastrophic outcome in this case. *MCG Health*, 285 Ga. App. at 585 (4). The Hospital Defendants' causation argument thus is unpersuasive, and the trial court committed no error in denying the Hospital Defendants' motion for summary judgment on that ground.

2. SGMC contends that the trial court erred in denying its motion for summary judgment on the plaintiffs' claims against it for the negligent hiring, training, supervision, and retention of Brackin. According to SGMC, the plaintiffs were limited to pursuing a vicarious liability claim against SGMC based on the doctrine of respondeat superior, given that SGMC has conceded that it can be held liable under that doctrine if Brackin is found negligent in performing the ultrasound study, and given that the plaintiffs are not seeking punitive damages. We agree with SGMC.

Under Georgia law, if a defendant employer concedes that it will be vicariously liable under the doctrine of respondeat superior if its employee is found negligent, the employer is entitled to summary judgment on the plaintiff's claims for negligent entrustment, hiring, training, supervision, and retention, unless the plaintiff has also brought a valid claim for punitive damages against the employer for its own independent negligence (hereinafter, the "Respondeat Superior Rule"). See *Mastec N. America v. Wilson*, 325 Ga. App. 863, 865 (755 SE2d 257) (2014); *Kelley v. Blue Line Carriers*, 300 Ga. App. 577, 580 (2) (685 SE2d 479) (2009); *Durben v. American Materials*, 232 Ga. App. 750, 751 (1) (503 SE2d 618) (1998); *Bartja v. Nat. Union Fire Ins. Co. of Pittsburgh, Pa.*, 218 Ga. App. 815, 817 (2) (463 SE2d 358) (1995). One reason for this rule is because allowing such claims "would not entitle the plaintiff to a greater recovery, but would merely serve to prejudice the employer" through, for example, the introduction of unfairly prejudicial information about the employee's prior employment history. *Mastec N. America*, 325 Ga. App. at 865.

Here, SGMC admitted that Brackin was acting within the course and scope of her employment with SGMC when she performed the ultrasound and that it could be held liable under the doctrine of respondeat superior if Brackin is found negligent.

18

Because SGMC has admitted the applicability of respondeat superior and the plaintiffs have not asserted a claim for punitive damages, SGMC is entitled to summary judgment on the plaintiffs' claims of negligent hiring, training, supervision, and retention based on the Respondeat Superior Rule.

The plaintiffs argue that the Respondeat Superior Rule should not be applied in the medical malpractice context. It is true that there is a limited exception to the Respondeat Superior Rule for claims brought against a hospital for the negligent credentialing of staff physicians and other similar medical providers. See *Wellstar Health Sys. v. Green*, 258 Ga. App. 86, 88 (1) (572 SE2d 731) (2002). This is because "a hospital has a direct and independent responsibility to its patients to take reasonable steps to ensure that staff physicians using hospital facilities are qualified for privileges granted." (Punctuation and footnote omitted.) *McCall v. Henry Med. Center*, 250 Ga. App. 679, 681 (1) (551 SE2d 739) (2001). See *Wellstar Health Sys.*, 258 Ga. App. at 88 (1) (permitting negligent credentialing claim for failure to ensure that certified nurse practitioner was qualified for privileges granted at hospital). Moreover, unlike vicarious liability claims based on respondeat superior, negligent credentialing claims are "not dependent on a master-servant relationship." (Citation and punctuation omitted.) *Wellstar Health Sys.*, 258 Ga. App. at 88 (1). However, the

19

plaintiffs did not bring a negligent credentialing claim in this case, and thus the exception for those claims to the Respondeat Superior Rule is inapplicable.

The plaintiffs also argue that the Respondeat Superior Rule has been superseded by Georgia's apportionment statute, OCGA § 51-12-33 (b).[2] Our courts have not directly addressed this argument,[3] but in a different context, we have held that the apportionment statute does not apply where a defendant employer faces only vicarious liability under the doctrine of respondeat superior because the employer and employee "are regarded as a single tortfeasor." *PN Express v. Zegel*, 304 Ga. App.

---

[2] OCGA § 51-12-33 (b) provides:

Where an action is brought against more than one person for injury to person or property, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall after a reduction of damages pursuant to subsection (a) of this Code section, if any, apportion its award of damages among the persons who are liable according to the percentage of fault of each person. Damages apportioned by the trier of fact as provided in this Code section shall be the liability of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution.

[3] However, without specifically considering or addressing this issue, our courts have continued to apply the Respondeat Superior Rule even after the passage of the current version of the apportionment statute, which was enacted as part of the Tort Reform Act of 2005. See Ga. L. 2005, p. 1, § 12; *Mastec N. America*, 325 Ga. App. at 865; *Kelley*, 300 Ga. App. at 580 (2).

672, 680 (5) (697 SE2d 226) (2010). See also *Camelot Club Condo. Assoc. v. Afari-Opoku*, 340 Ga. App. 618, 626 (2) (b) (798 SE2d 241) (2017).

Like claims based on respondeat superior, claims against a defendant employer for the negligent hiring, training, supervision, and retention of an employee are derivative of the underlying tortious conduct of the employee. See *Metropolitan Atlanta Rapid Transit Auth. v. Mosley*, 280 Ga. App. 486, 489 (2) (634 SE2d 466) (2006); *Oswell v. Nixon*, 275 Ga. App. 205, 208 (1) (620 SE2d 419) (2005); *Phinazee v. Interstate Nationalease*, 237 Ga. App. 39, 41 (514 SE2d 843) (1999); *Coleman v. Housing Auth. of Americus*, 191 Ga. App. 166, 167 (1) (381 SE2d 303) (1989). Thus, where, as here, the employer has admitted respondeat superior liability and the plaintiff is not seeking punitive damages, the claims for negligent hiring, training, supervision, and retention "are merely duplicative of the respondeat superior claim." *Mastec N. America*, 325 Ga. App. at 865.

Given that we have held that the apportionment statute does not apply to claims based on respondeat superior liability, see *PN Express*, 304 Ga. App. at 680 (5), we discern no basis for applying the statute to the "merely duplicative" claims of negligent hiring, training, supervision, and retention. Accordingly, the plaintiffs' argument based on the apportionment statute is misplaced, and summary judgment

21

should have been granted to SGMC on the plaintiffs' negligent hiring, training, supervision, and retention claims based on the Respondeat Superior Rule.[4]

*Case No. A17A0003*

3. The Radiology Defendants contend that the trial court erred in denying their supplemental motion for summary judgment because the uncontroverted evidence showed that the plaintiffs' claims were barred by the applicable two-year statute of limitation. We disagree for the reasons discussed supra in Division 1 (a).

4. The Radiology Defendants further argue that the trial court erred in denying their motion to exclude the expert opinions of Dr. Evans because the plaintiffs failed to demonstrate that his opinions were sufficiently reliable to be admissible.[5] We are unpersuaded.

---

[4] The federal district court in *Little v. McClure*, No. 5:12-CV-147 (MTT), 2014 U.S. Dist. LEXIS 120681, at *7-8 (II) (B) (N.D. Ga. Aug. 29, 2014) held that Georgia's apportionment statute superseded the Respondeat Superior Rule. But "[a]s a state appellate court, we are not bound by the decisions of the federal district courts. To the contrary and as a general matter, this Court adopts such federal decisions only when they are not in conflict with our own legal precedent." (Citations and punctuation omitted.) *RES-GA Hightower v. Golshani*, 334 Ga. App. 176, 180 (1) (a), n. 8 (778 SE2d 805) (2015).

[5] While the Hospital Defendants also filed a motion to exclude Dr. Evans' testimony that was denied by the trial court, they did not challenge that ruling in their companion appeal.

OCGA § 24-7-702 (b), which governs the admissibility of expert opinion testimony in civil cases under Georgia's new Evidence Code,[6] provides:

> (b) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

The trial court's role under OCGA § 24-7-702 (b) is to act as a gatekeeper who ensures the relevance and reliability of proposed expert opinion testimony. *Scapa*

---

[6] Because the Radiology Defendants filed their motion to exclude Dr. Spell's expert testimony in October 2014, OCGA § 24-7-702 (b), under Georgia's new Evidence Code, applies. See Ga. Laws 2011, Act 52, § 101 (new Evidence Code "shall become effective on January 1, 2013, and shall apply to any motion made or hearing or trial commenced on or after such date"). However, the former statutory provision governing the admissibility of expert opinion testimony, OCGA § 24-9-67.1 (b), contained almost identical language. See *Scapa Dryer Fabrics v. Knight*, 299 Ga. 286, 288, n. 4 (788 SE2d 421) (2016). Thus, we will rely on case law interpreting that former provision as part of our analysis.

23

*Dryer Fabrics v. Knight*, 299 Ga. 286, 289 (788 SE2d 421) (2016). See *Daubert v. Merill Dow Pharmaceuticals*, 509 US 579, 597 (IV) (113 SCt 2786) (125 LE2d 2d 469) (1993). "Generally speaking, a trial court must assess three aspects of proposed expert testimony – the qualifications of the expert, the reliability of the testimony, and the relevance of the testimony – to discharge its responsibilities as a gatekeeper under [OCGA § 24-7-702 (b)]." *Scapa Dryer Fabrics*, 299 Ga. at 289. A trial court's determination regarding the admissibility of expert opinion testimony "will not be disturbed absent a manifest abuse of discretion." (Citation and punctuation omitted.) *HNTB Ga. v. Hamilton-King*, 287 Ga. 641, 642 (1) (697 SE2d 770) (2010).

The Radiology Defendants do not challenge Dr. Evans' qualifications as an expert. Instead, the Radiology Defendants' sole argument is that the trial court manifestly abused its discretion in finding that Dr. Spell's expert opinion testimony was reliable. Specifically, the Radiology Defendants challenge the reliability of Dr. Spell's expert opinion that Mr. Fender had "significant stenosis" in his left internal carotid artery in May 2009 that was of greater severity than diagnosed by Dr. Spell. According to the Radiology Defendants, Dr. Evans' opinion was inherently unreliable and should have been excluded because it was based "solely" upon his interpretation of the longitudinal grayscale images taken by Brackin during the May 2009

24

ultrasound study, while ignoring cross-sectional measurements and velocity measurements of the stenosis that had also been taken by Brackin.

The Radiology Defendants' argument is unpersuasive. Contrary to their assertion, the record reflects that Dr. Evans did not base his opinion regarding the significance of the stenosis in May 2009 "solely" on the longitudinal grayscale images taken by Brackin. Rather, Dr. Evans testified that he also took into account the fact that by April 2010, Mr. Fender's stenosis in the artery had progressed to 100 percent. Dr. Evans opined that, based on his extensive training and experience with ultrasounds and carotid artery procedures, the progression of the stenosis to 100 percent in only 11 months most probably reflected a stenosis of greater than 50 percent in May 2009, rather than the rapid progression of a "tiny, insignificant plaque to occlusion in [the] short 11-month time frame." Furthermore, the record indicates that Dr. Evans did not simply "ignore" the cross-sectional measurements and velocity measurements of the stenosis taken by Brackin in May 2009; rather, he analyzed the measurements during his deposition testimony and concluded that the measurements were inaccurate in assessing the degree of stenosis, were taken at the wrong locations, and were "not helpful."

25

The Radiology Defendants also argue that Dr. Evans's opinions that the May 2009 ultrasound showed stenosis that exceeded 50 percent in Mr. Fender's left internal carotid artery, and peak blood flow velocities in excess of 150 centimeters per second, were based on speculation and guesswork, given that Dr. Evans conceded during his deposition that he lacked certain information and data necessary for accurately measuring stenosis. The record reflects, however, that Dr. Evans simply refused to guess or speculate on the "exact" or "actual" percentage of stenosis present in May 2009 without additional data. In contrast, Dr. Evans opined that Mr. Fender clearly had a "large-appearing plaque" in his left internal carotid artery and a "significant stenosis" not identified as such by Brackin or Dr. Spell in May 2009, and that he could estimate that the stenosis exceeded 50 percent based on his training and experience interpreting carotid ultrasounds, his analysis of the grayscale images, and the subsequent April 2010 ultrasound results.

Lastly, the Radiology Defendants contend that Dr. Evans' causation opinion – that Mr. Fender would have undergone surgical intervention and avoided a massive stroke if the degree of his stenosis had been properly diagnosed in May 2009 – was unreliable because Dr. Evans conceded during his first deposition that he lacked sufficient facts and data to support his opinion that Mr. Fender would have been a

candidate for surgery before his April 2010 stroke. But in his second deposition, Dr. Evans testified that he had recently reviewed Mrs. Fender's deposition and had learned of Mr. Fender's loss of peripheral vision in his left eye during the May 2009 incident. Dr. Evans testified that Mr. Fender's vision issue was a classic symptom of carotid arterial stenosis that, when combined with the stenosis of greater than 50 percent that was present in the artery, would have made Mr. Fender a candidate for immediate surgical intervention rather than surgery "down the road." Thus, the Radiology Defendants' reliance on Dr. Evan's alleged concession is misplaced. Given the record in this case, we cannot say that the trial court manifestly abused its discretion in denying the Radiology Defendants' motion to exclude the expert opinion testimony of Dr. Evans.

*Judgment affirmed in part; reversed in part; and case remanded with instruction in Case No. A17A0002. Judgment affirmed in Case No. A17A0003. Barnes, P. J., and Mercier, J., concur.*