S08G0721. CLEAVELAND v. GANNON et al.
S08G0713. ENTREKIN et al. v. GANNON et al.

(667 SE2d 366)

CARLEY, Justice.

In June of 2000, William Gannon underwent an appendectomy. In connection with that procedure, a CT scan was performed which showed two masses in his left kidney. Urinalysis also revealed that he had microscopic hematuria, which is blood in the urine that is only visible with a microscope. He was referred to Dr. Lynwood Cleaveland for urological consultation. Dr. Cleaveland told Mr. Gannon that he had a small cyst in his kidney which was common and did not need treatment, but that he should see his primary care physician regarding the hematuria.

When Mr. Gannon followed up with his doctors at Internal Medicine Associates of Rockdale, PC (IMA), another urinalysis was performed which confirmed microscopic hematuria. However, Dr. John Entrekin did not diagnose a particular cause, because that condition is not uncommon and there were multiple explanations for why Mr. Gannon exhibited it. Mr. Gannon also received treatment from Dr. Deborah Goodrich, but she too failed to diagnose or attempt to diagnose the precise cause of his microscopic hematuria. On October 31, 2002, Mr. Gannon first noticed a suspicious lump in his neck. A biopsy of that lump showed that he had kidney cancer which had become metastatic.

On October 29, 2004, Mr. Gannon and his wife (Appellees) filed suit against Dr. Cleaveland, IMA, Dr. Entrekin and Dr. Goodrich (Appellants), claiming negligent failure to diagnose his kidney cancer which then later metastasized. In support of their claim, Appellees presented expert opinion testimony that the masses initially detected in Mr. Gannon's kidney in 2000 were cancerous, that the cancer later spread and that, had the cancer been diagnosed and treated before it metastasized, a complete recovery would have been likely. When Mr. Gannon died from complications of his kidney cancer, his wife amended the complaint to allege a wrongful death claim. After discovery, Appellants IMA, Dr. Entrekin and Dr. Goodrich and Appellant Dr. Cleaveland filed separate motions for summary judgment, on the ground that the original claim against them was barred by the two-year statute of limitations and that the subsequent wrongful death claim was barred by the five-year statute of repose. The trial court denied the motions, and the Court of Appeals granted Appellants' applications for interlocutory review. In a whole court decision, the denial of summary judgment was affirmed. *Cleaveland v. Gannon*, 288 Ga. App. 875 (655 SE2d 662) (2007). Appellants filed separate applications for certiorari, which were granted in order to address the continued viability of the

"subsequent" or "new injury" exception to the general rule that, when the patient's medical malpractice claim is based upon negligent misdiagnosis, the statutes of limitations and repose commence to run immediately. See also *Amu v. Barnes*, 283 Ga. 549 (662 SE2d 113) (2008) (certiorari granted to address the same issue). The two appeals have been treated as companion cases, and are hereby consolidated for disposition in this single opinion.

1. As explained by the Court of Appeals, the "new injury" exception

> originated with *Whitaker v. Zirkle*, 188 Ga. App. 706 (374 SE2d 106) (1988). This limited exception to the general rule applies in cases in which the patient's injury arising from the misdiagnosis occurs subsequently, generally when a relatively benign or treatable precursor condition, which is left untreated because of the misdiagnosis, leads to the development of a more debilitating or less treatable condition. [Cits.] Thus, the deleterious result of a doctor's failure to arrive at the correct diagnosis in these cases is not pain or economic loss that the patient suffers beginning immediately and continuing until the original medical problem is properly diagnosed and treated. Rather, the injury is the subsequent development of the other condition.

*Cleaveland v. Gannon*, supra at 878 (1). Appellants urge that this "new injury" exception conflicts with the recent holding in *Kaminer v. Canas*, 282 Ga. 830 (653 SE2d 691) (2007), and that *Whitaker* and its progeny must, therefore, be overruled.

*Kaminer*, supra at 835 (1), holds that

> "[t]he General Assembly has determined that medical malpractice actions must be filed within two years of the occurrence of injury or death arising from a negligent or wrongful act or omission. (Cit.) The legislatively-prescribed statute of limitation(s) does not provide for the commencement of the period of limitation (at any other point), and the judicial branch is not empowered to engraft such a provision on to what the legislature has enacted. [Cit.]"

In *Amu*, however, we also recognized that the "new injury" exception is consistent with the statutory requirement that the statute of limitations on a medical malpractice claim commence on the date of "injury." The exception comports with OCGA § 9-3-71 (a) because, when the misdiagnosed and, consequently, untreated precursor condition subsequently develops into a more serious and debilitating

medical condition, the patient experiences "a 'new injury' which did not exist at the time of the original misdiagnosis, but which is a proximate result of [the physician's] negligence. [Cits.]" *Amu v. Barnes*, supra at 552.

> The statute establishes the occurrence of an "injury" as the trigger for commencement of a medical malpractice claim, but does not purport to limit the number of "injuries" that may result from the negligent act or omission. The "new injury" exception is an attempt to reconcile the statute's requirement that the period of limitations commence on the date of the patient's "injury," on the one hand, with a recognition, on the other, that not all "injuries" are necessarily the immediate consequence of a physician's negligent misdiagnosis.

*Amu v. Barnes*, supra at 551-552.

The holdings in *Kaminer* and *Amu* are not inconsistent, but result from the differing facts upon which each respective malpractice claim was based. *Kaminer*, supra at 837 (2), clearly noted that the "new injury" exception did not apply under the facts of that case. Instead, the patient there continued to suffer from exactly the same AIDS condition that his doctors originally failed to diagnose. Therefore, as a result of a lack of treatment, he did not develop any new and more deleterious underlying condition in addition to AIDS, and only experienced symptoms that were attributable to the worsening of that same condition. The patient's AIDS was no less treatable at the time suit was eventually filed than it had been treatable at the time it was misdiagnosed. There is a significant legal distinction between a patient's development of an entirely new medical condition, and his experiencing the proximate symptomatic consequences of the original misdiagnosis. "If [the patient's subsequent] symptoms were symptoms of the same injury that existed at the time of the alleged misdiagnosis, then the claim is barred by the two-year limitation[s] period." *Kitchens v. Brusman*, 280 Ga. App. 163, 165 (2) (633 SE2d 585) (2006). Had the proper diagnosis been reached in *Kaminer*, the patient could have been treated earlier, and thereby possibly avoided experiencing subsequent symptoms attributable to AIDS. However, he could not claim that he suffered any pain or economic loss other than that proximately caused by his unchanged AIDS condition.

Here, unlike in *Kaminer*, but as in *Amu*, the allegation is that Mr. Gannon suffered from an undiagnosed precursor condition, which was treatable cancer confined to his kidney, and that he thereafter experienced a "new injury," which is metastasized un-

treatable cancer that is no longer confined to the kidney. Thus, insofar as the existence of a "new injury" is concerned, this case is factually analogous to *Amu* and distinguishable from *Kaminer*. Mr. Gannon did not merely experience subsequent symptoms of a worsening of his misdiagnosed, but treatable, kidney cancer. Compare *Kaminer v. Canas, supra*. At some point, the magnitude of his undiagnosed condition evolved into a "new injury" in which other internal organs, that were unaffected at the time of the misdiagnosis, were compromised and the cancer became life-threatening.

In one respect, however, Appellants are correct that *Whitaker* is in seeming conflict with *Kaminer*. According to *Whitaker, supra* at 708 (1), "[w]hen an injury occurs subsequent to the date of medical treatment, the statute of limitation[s] commences from the date the injury is discovered. [Cit.]" In *Kaminer, supra* at 832 (1), however, we held that,

> [b]ecause OCGA § 9-3-71 (a) provides that the period of limitation begins to run at the time of injury, "initiating the period of limitation in a medical malpractice action (at some other point, such as) when the alleged negligence is first discovered would be contrary to the plain language of" the statute. [Cit.]

Thus, although *Whitaker* correctly articulated a "new injury" exception, the commencement of the applicable period of limitations was misstated as the date of "discovery" of that injury. The true rule is that, "[w]hen a misdiagnosis results in subsequent injury that is difficult or impossible to date precisely, the statute of limitation[s] runs from the date symptoms attributable to the new injury are manifest to the plaintiff. [Cits.]" *Walker v. Melton*, 227 Ga. App. 149, 151 (1) (b) (489 SE2d 63) (1997).

> [T]he "new injury" exception is not predicated on the patient's discovery of the physician's negligence [or discovery of the existence of the "new injury" itself]. Consistent with OCGA § 9-3-71 (a), the trigger for commencement of the statute of limitations is the date that the patient received the "new injury," which is determined to be an occurrence of symptoms following an asymptomatic period.... "[T]he focus on manifested symptoms is intended to serve as a straight-forward analytic tool for identifying the date when the new injury actually arose, given the difficulty, if not impossibility, in many cases of accurately pinpointing that date, given that the new injury arises 'at a time between the misdiagnosis and the correct diagnosis,

when the patient (is) not experiencing symptoms.' (Cits.)" [Cit.] Thus, the "new injury" exception is entirely consistent with the statutory requirement that the statute of limitations commence on the date of "injury," " 'even if the patient is not aware of either the cause of the pain or of the connection between the symptoms and the negligent act or omission.' (Cit.)" [Cit.]

*Amu v. Barnes*, supra at 553-554.

The intent in *Whitaker* may have been that "the date the injury is discovered" refers to the date that the patient, having been asymptomatic for a period, first experienced symptoms of his "new injury." However, so as to clarify the law and eliminate any ambiguity, we disapprove language in *Whitaker* and its progeny that could be interpreted as authority for the proposition that the two-year statute of limitations on a "new injury" claim commences on the date the patient "discovered" either the injury or the doctor's negligence, rather than the date the patient first experienced symptoms of his "new injury" following a symptom-free period.

2. Appellants urge that, even if the "new injury" exception remains a viable legal principle, it does not apply here because, following the misdiagnosis, Mr. Gannon did not experience an asymptomatic period.

One reason that a period without symptoms is a necessary component of the "new injury" exception is so that any pain, suffering and economic loss that is attributable thereto can be separated and distinguished from the pain, suffering and economic loss resulting from the misdiagnosis of the original condition. The other basis for the requirement that the patient be asymptomatic after the original misdiagnosis relates to the establishment of the date that the statute of limitations commences on the "new injury."

*Amu v. Barnes*, supra at 553.

The question is not whether Mr. Gannon was asymptomatic for the kidney cancer that was present at the time of the misdiagnosis. The subsequent injury exception applies here [if], for a period of time following the misdiagnosis, Mr. Gannon was asymptomatic for the *metastatic* cancer that constitutes his injury. If, on the other hand, symptoms attributable to the metastatic cancer had already been present at the time of the negligent misdiagnosis, then the subsequent injury exception would not apply. [Cits.] (Emphasis in original.)

*Cleaveland v. Gannon*, supra at 879 (1), fn. 5.

> In addressing this question, we note that the defense of statute of limitation[s] is an affirmative defense under OCGA § 9-11-8 (c), and so the burden was on [Appellants] to show that the two-year statute of limitation[s] barred [Appellees'] suit. [Cit.] . . . Thus, at the summary judgment stage, the burden was on [Appellants] to come forward with evidence demonstrating as a matter of law that [Mr. Gannon's new] injury occurred and manifested itself more than two years before [the] malpractice suit was commenced. [Cit.]

*Brown v. Coast Dental of Ga.*, 275 Ga. App. 761, 767 (1) (622 SE2d 34) (2005).

After the failure to diagnose Mr. Gannon's condition in June of 2000, he was tested again for microscopic hematuria and the results were positive. However, this evidence does not demand a finding that, as a matter of law, he was experiencing a symptom of either kidney or metastatic cancer. According to Dr. Cleaveland's own testimony, Mr. Gannon had

> hematuria for years before I saw him. . . . I know he had kidney problems and hematuria for years prior to me ever walking in the room. . . . I don't know if there was a specific diagnosis before, but he had several problems which could cause hematuria. Three on my record, renal insufficiency, hypertension and gout, all three which can sometimes lead to hematuria. . . . [Hematuria is] the normal thing that people have when they have [renal] insufficiency. It explained it in other words. . . . [I]t makes [cancer] less likely.

This testimony was consistent with other medical evidence indicating that Mr. Gannon's hematuria was a preexisting condition that was not connected with either his precursor condition at the time of the misdiagnosis or his subsequent injury. If the medical experts who examined him at the time did not consider the microscopic hematuria to be symptomatic of kidney cancer, there is no basis for holding, as a matter of law, that Mr. Gannon was symptomatic of metastatic cancer simply because he tested positive for microscopic hematuria on one single occasion after the misdiagnosis. The evidence establishes that his microscopic hematuria was a basis for ordering further testing to determine whether kidney cancer was the cause, not an undisputed symptom of metastasized cancer.

There is also evidence that on one occasion in August of 2002,

Mr. Gannon observed a small amount of blood in his urine. Because the blood was visible, this was an instance of gross, rather than microscopic, hematuria. However, Mr. Gannon did not consult a doctor because the condition immediately resolved itself after he self-medicated for a possible bladder infection. The evidence does not establish, as a matter of law, that this single occurrence of gross hematuria was a symptom of metastatic cancer, rather than merely a symptom of the suspected bladder infection or some other cause unconnected with the "new injury."

Mr. Gannon also experienced a period of "night sweats" in 2002. Again, however, the evidence did not demand a finding that that was necessarily a symptom of metastatic cancer. In fact, there was expert medical testimony that "[i]t would go along with metastatic cancer, but it could have been other things as well." One possible explanation may have been supplied by Mrs. Gannon, who is a nurse. She stated that the period of "night sweats" coincided with her husband's start of "his new job. It was requiring a lot of time. He was coming home and he was tired."

Ultimately, Appellants rely on medical opinion testimony which identifies the chronic microscopic hematuria, the one instance of gross hematuria and the "night sweats" as "likely" symptoms of metastatic cancer. However, the case is on summary judgment, and the evidence must be construed most favorably for Appellees. The record contains other evidence which, when construed most strongly in their favor, authorizes a finding that, following his misdiagnosis in June of 2000, Mr. Gannon experienced a period when he was asymptomatic of metastatic cancer.

Moreover, even if the expert opinion testimony identifying the microscopic and gross hematuria and the "night sweats" as likely symptoms of metastatic cancer was undisputed, Appellants still would not be entitled to summary judgment. As to the statute of limitations defense, Appellants had the burden of proof and, thus, could not obtain summary judgment based on opinion testimony.

3. Appellants also contend that summary judgment should have been granted based on the opinion testimony of Appellees' own medical expert that it was "[m]ore likely than not" that Mr. Gannon's cancer metastasized in "late 2001." Appellants argue that this testimony establishes, as a matter of law, that the "new injury" occurred more than two years before suit was filed in October of 2004.

Even assuming that opinion testimony could otherwise support the grant of summary judgment in Appellants' favor on the statute of limitations defense (but see *Savannah Valley Credit Production Assn. v. Cheek*, 248 Ga. 745 (285 SE2d 689) (1982)), the equivocal

nature of the expert testimony regarding the "likely" date of metastasis demonstrates why it has no relevancy to that issue.

> The date when . . . a subsequent injury occurs . . . is often difficult, if not impossible, to calculate precisely. [Cit.] Because of this, under *Whitaker v. Zirkle* and its progeny, "(w)hen a misdiagnosis results in subsequent injury that is difficult or impossible to date precisely, the statute of limitation[s] runs from the date symptoms attributable to the new injury are manifest to the plaintiff." [Cit.]

*Cleaveland v. Gannon,* supra at 879 (1). Thus, entirely subjective expert opinion testimony as to the "likely" date that Mr. Gannon's treatable kidney cancer metastasized is immaterial to the legal determination of commencement of the statute of limitations. Under the "new injury" exception, what controls is the objective date that the symptoms of the metastasis of his cancer first manifest themselves to him. Construing the evidence most strongly in favor of Appellees, that occurred in October of 2002, when Mr. Gannon first noticed the suspicious lump in his neck.

> Because [Appellees] filed their complaint within two years after this symptom attributable to the metastatic cancer first appeared, the trial court correctly ruled that the [A]ppellants are not entitled to summary judgment on the basis of the statute of limitation[s]. [Cits.]

*Cleaveland v. Gannon,* supra at 880 (1).

*Judgments affirmed. All the Justices concur, except Melton, J., who concurs specially.*

SEARS, Chief Justice, concurring.

I write separately merely to point out that as in *Amu v. Barnes,* there is no meaningful distinction between this case and our decision last year in *Kaminer v. Canas.*[1] Substitute "AIDS" for "cancer," and the Court's description of Gannon's experience mirrors perfectly the situation in *Kaminer*:

> At some point, the magnitude of his undiagnosed condition evolved into a "new injury" in which other internal organs, that were unaffected at the time of the misdiagnosis, were compromised and the [AIDS] became life-threatening.[2]

---

[1] *Kaminer v. Canas,* 282 Ga. 830 (653 SE2d 691) (2007). See *Amu v. Barnes,* 283 Ga. 549 (662 SE2d 113) (2008) (Sears, C. J., concurring).

[2] Maj. opinion, p. 379.

Consequently, and because I agree that the majority reaches the correct result in this case, I concur.

MELTON, Justice, concurring specially.

As I did in *Amu v. Barnes*, 283 Ga. 549 (662 SE2d 113) (2008), I write separately in this case to emphasize that a patient must experience an asymptomatic period between the initial misdiagnosis and the onset of new symptoms in order for the "new injury" exception to apply. See, e.g., *Burt v. James*, 276 Ga. App. 370 (623 SE2d 223) (2005). The presence or lack of an asymptomatic period is a critical factual determination in all cases of this type, whether the underlying illness is HIV infection as in *Kaminer v. Canas*, 282 Ga. 830 (653 SE2d 691) (2007), or cancer as in *Amu*, supra. Here, a question of fact remains regarding whether the patient experienced an asymptomatic period. As a result, the Appellants' summary judgment motions were properly denied.

DECIDED SEPTEMBER 22, 2008.

*Martin Snow, Richard A. Epps, Jr., Robert R. Gunn II*, for appellants (case no. S08G0713).

*Owen, Gleaton, Egan, Jones & Sweeney, Rolfe M. Martin, Mark D. Meliski, H. Andrew Owen, Jr.*, for appellant (case no. S08G0721).

*Maniklal & Dennis, Preyesh K. Maniklal, Charles M. Cork III, Warshauer, Poe & Thornton, James M. Poe, Christopher J. McFadden, Bobby-Thompson Chudi Aniekwu*, for appellees.

*Peters & Monyak, Robert P. Monyak, Jeffrey S. Bazinet, Donald J. Palmisano, Jr., Henry, Spiegel, Fried & Milling, Harvey R. Spiegel, Pope & Howard, J. Marcus Edward Howard*, amici curiae.