**FIFTH DIVISION
MCFADDEN, P. J.,
RAY and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 21, 2018**

# In the Court of Appeals of Georgia

A18A0155. ADAMS et al. v. McDONALD et al.

RAY, Judge.

Physician Kelly Adams and her husband, Joseph Daniel Adams, Jr. (collectively "Kelly Adams"), brought a medical malpractice action against Dr. Edward F. McDonald, The Longstreet Clinic, P. C., Dr. Laroy P. Penix, Northeast Georgia Physicians Group, Inc., and Northeast Georgia Medical Center (collectively the "Appellees").[1] Kelly Adams alleges that the Appellees were negligent and deviated from the standard of care. She argues that the Appellees failed to order an echocardiogram and misdiagnosed her with, inter alia, migraine headaches, when in actuality she had a benign heart tumor. Because the tumor was not promptly identified

---

[1] Kelly Adams sued Northeast Georgia Physicians Group, Inc., and Northeast Georgia Medical Center under a vicarious liability theory.

and treated, she alleges that she ultimately suffered a stroke, brain damage, and partial vision loss, all as a proximate result of the Appellees' negligence.

After the trial court granted the Appellees' motions for summary judgment, Kelly Adams appealed. She contends that the trial court erred in finding that her claims are barred by the two-year statute of limitation of OCGA § 9-3-71 (a) applicable to medical malpractice actions. Because fact questions exist as to whether Kelly Adams suffered a new injury, we reverse.

> Summary judgment should be granted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). Our review of a grant of summary judgment is de novo, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citation omitted.) *Ward v. Bergen*, 277 Ga. App. 256, 256 (626 SE2d 224) (2006). The Appellees bear the burden producing "undisputed evidence showing as a matter of law that [Kelly Adams] manifested symptoms of her injury caused by the alleged misdiagnosis more than two years before her suit was commenced[.]" *Brown v. Coast Dental of Ga., P. C.*, 275 Ga. App. 761, 761 (622 SE2d 34) (2005). Accord *Ward*, supra at 260 (a defendant moving for summary judgment on the affirmative defense

2

of statute of limitation, see OCGA § 9-11-8 (c), bears the burden of proof and may not rely on an absence of evidence in the record). "Accordingly, under this standard, [the Appellees are] entitled to summary judgment only if the undisputed evidence showed that [Kelly Adams] experienced symptoms of her [heart tumor] before [September 10, 2013,] , two years prior to the filing of her malpractice suit." *Ward*, supra at 260.

Viewed in the light most favorable to Kelly Adams as the non-moving party, the evidence shows she was at work as a neonatologist for Longstreet Clinic, P. C., in the neonatal intensive care unit at Northeast Georgia Medical Center on January 31, 2013. While speaking with a nurse, Kelly Adams deposed that she had "the sudden onset of a mechanical swishing sound in my ears followed by the room doubling and me being unable to keep my eyes open. . . . I could hear [the nurse] speaking, but I couldn't respond to her." The nurse noticed that Kelly Adams's "eyes were going in different directions[.]" Kelly Adams experienced "a feeling kind of like a flame of fire . . . from the back of my head that extended around to the front of my head[.]" She also felt as if the room were spinning and had pain in her head. The nurses put her in a wheelchair and took her to the emergency department (the "ED"), where the physician on duty examined her. He deposed that she complained of

3

"vertigo, lightheadedness, . . . some headache [in the occipital region], some visual disturbance, scotoma[2] and double vision [and] . . . near syncope[.][3]" He deposed that this combination of symptoms, independently or in combination, could indicate a transient ischemic attack ("TIA"),[4] but did not raise his concern for a cerebrovascular event. Dr. Laroy Penix, a neurologist and one of the Appellees, also examined Kelly Adams while she was at the ED. Dr. Penix's notes state that Kelly Adams reported no prior significant neurological problems, but did report occasional prior vertigo, ear aches and Eustachian tube problems, and a short episode of "visual obscuration" the evening prior to her ED admission. Dr. Penix reported that on January 31, 2013, Kelly Adams reported a "wavy appearance in the far left visual field," vertigo, and a sensation that the room was spinning and that her eyes were jumping. Dr. Penix

---

[2] Scotoma is "a spot in the visual field in which vision is absent or deficient." See https://www.merriam-webster.com/dictionary/scotoma (last visited June 11, 2018).

[3] Near syncope is "light-headedness and a sense of an impending faint" without loss of consciousness. See https://www.merckmanuals.com/ *professional/cardiovascular-disorders/symptoms-of-cardiovascular-disorders/syn cope* (last visited June 11, 2018).

[4] "A transient ischemic attack (TIA) is like a stroke, producing similar symptoms, but usually lasting only a few minutes and causing no permanent damage." See https://www.mayoclinic.org/diseases-conditions/transient-*ischemic-attack/symptoms-causes/syc-20355679* (last visited June 11, 2018).

"suspect[ed] that the differential diagnosis includes a benign positional vertigo versus a basilar migraine."

Shortly after discharge, Kelly Adams consulted with an otolaryngologist on February 4, 2013, who diagnosed her with a Eustachian tube dysfunction, headache, and a balance disorder. She then saw a neurologist, Appellee Dr. Edward F. McDonald, beginning February 6, 2013. His records from that date indicate that she presented with a complaint of possible "TIA/migraine," and that after seeing Dr. Penix in the ED, she had a "headache that lasted days." His notes from her visit indicate that she did not report dizziness, but reported numbness and headache, and blurred and double vision. After evaluating her, however, he no longer considered a TIA an explanation for her symptoms. His clinical notes show a diagnosis of "migraine classical w/o intractable migraine." Kelly Adams deposed that by her second visit, she was having some "neurologic visual issues" and asked what could be causing them, and he was "very adamant that I had migraines and that they were only migraines." She kept a headache diary, and Dr. McDonald's notes reflect she reported four headaches at an office visit on March 5, 2013, and "scintillating scotoma symptoms which was the starry pattern[s] that were described as visual migraines" and "mild head pain." There also were two notes in the medical records

5

dated April 2013 which documented headaches or migraines. Kelly Adams deposed that those were the terms she had been given to describe the "visual, starry patterns with minimal head pain" that she experienced.

Dr. McDonald's notes from an office visit on September 3, 2013, which was shortly before her stroke, say Kelly Adams presented with a "migraine," but also that she "has not had any severe migraines." Kelly Adams deposed that "[t]he episodes that I had in the weeks and months following January 31st were different, completely different in nature than the episode that occurred on January 31st[,]" in that she only had a "starry kind of sky pattern" called "visual migraines" and that her head "usually didn't hurt very much." She deposed that she had not had significant head pain or migraine pain between the episode on January 31, 2013, and her stroke on September 17, 2013, when she experienced the first recurrence of symptoms like those she had felt on January 31, 2013.

On September 17, 2013, the date of her stroke, Kelly Adams experienced vertigo, right-side paresthesias, tingling in her right hand, blurred vision, especially in her right eye, and a severe headache, and she went to the ED. The physician's notes state that "[t]he presentation is different from her typical migraine." The physician's notes also indicate that she had a "suspected" TIA in January 2013. Kelly Adams was

6

given an echocardiogram, which revealed a myxoma, which is a benign heart tumor, which was identified as the cause of her stroke. The myxoma was surgically removed the next day. Due to the stroke, Kelly Adams alleges that she suffered brain damage and vision loss. She now has a seizure disorder and daily headaches, and is unable to work full-time.

Although Kelly Adams was given a number of tests typically performed on patients with a suspected TIA at or after the initial incident on January 31, 2013, she was not given an echocardiogram until she presented to the ED on September 17, 2013, and when she was diagnosed with a stroke.

On September 10, 2015, she filed suit for malpractice, arguing that she was misdiagnosed by Drs. Penix and McDonald, neither of whom ordered an echocardiogram, which could have revealed the cardiac condition that ultimately led to her stroke. The Appellees moved for summary judgment, arguing that the suit was barred by the two-year statute of limitation imposed by OCGA § 9-3-71 (a) because the clock allegedly began to run on the dates of Kelly Adams's initial misdiagnoses, January 31, 2013, and February 6, 2013, rather than on the date of her stroke, September 17, 2013. Specifically, the Appellees contended that Kelly Adams continued to experience symptoms from the misdiagnosed condition between the

initial misdiagnoses and the later stroke, and that the stroke was merely a worsening of the earlier condition and not a new injury. Kelly Adams countered that, inter alia, her stroke constituted a new injury, that she was asymptomatic for a time, and that the statute of limitation should run from the date of the stroke.

OCGA § 9-3-71 (a) sets forth the statute of limitation in medical malpractice actions, providing, in pertinent part, that "an action for medical malpractice shall be brought within two years after the date on which an injury or death arising from a negligent or wrongful act or omission occurred."[5] That statute of limitation:

> runs from the date of the plaintiff's injury caused by the defendant's negligent act. In most misdiagnosis cases, the injury begins immediately upon the misdiagnosis due to the pain, suffering, or economic loss sustained by the patient from the time of the misdiagnosis until the medical problem is properly diagnosed and treated. The misdiagnosis itself is the injury and not the subsequent discovery of the proper diagnosis.

(Citations omitted.) *Brown*, supra at 765-766 (1). Accord *Kaminer v. Canas*, 282 Ga. 830, 831-832 (1) (653 SE2d 691) (2007). Stated more succinctly, in cases asserting

---

[5] Kelly Adams's husband raises a claim for loss of consortium. Loss of consortium actions arising out of medical malpractice also are subject to a two-year limitation period. *Beamon v. Mahadevan*, 329 Ga. App. 685, 688 (2) (766 SE2d 98) (2014).

a failure to diagnose, the general rule is that the limitation period runs from the misdiagnosis date.

"[T]his is not always the case, however, because the focus of OCGA § 9-3-71 (a) is not the date of the negligent act but the consequence of the defendant's acts on the plaintiff." (Citations and punctuation omitted.) *Sidlow v. Lewis*, 271 Ga. App. 112, 116 (2) (608 SE2d 703) (2004). An exception to the general rule applies

> in cases in which the patient's injury arising from the misdiagnosis occurs subsequently, generally when a relatively benign or treatable precursor condition, which is left untreated because of the misdiagnosis, leads to the development of a more debilitating or less treatable condition. Thus, the deleterious result of a doctor's failure to arrive at the correct diagnosis in these cases is not pain or economic loss that the patient suffers beginning immediately and continuing until the original medical problem is properly diagnosed and treated. Rather, the injury is the subsequent development of the other condition.

(Citation and punctuation omitted.) *Cleaveland v. Gannon*, 284 Ga. 376, 377 (1) (667 SE2d 366) (2008). This "new injury" exception

> comports with OCGA § 9-3-71 (a) because, when the misdiagnosed and, consequently, untreated precursor condition subsequently develops into a more serious and debilitating medical condition, the patient experiences a 'new injury' which did not exist at the time of the original

9

misdiagnosis, which is the proximate result of the physician's negligence.

(Citation and punctuation omitted.) Id. at 377-378 (1). In other words, our courts recognize that "not all 'injuries' are necessarily the immediate consequence of a physician's negligent misdiagnosis." *Amu v. Barnes*, 283 Ga. 549, 552 (662 SE2d 113) (2008). However, if the patient's later "symptoms were symptoms of the same injury that existed at the time of the alleged misdiagnosis, then the claim is barred by the two-year limitation period." *Kitchens v. Brusman*, 280 Ga. App. 163, 165 (2) (633 SE2d 585) (2006). The "new injury" exception does not turn on the patient's discovery of the physician's negligence or the discovery of the new injury itself. *Cleaveland*, supra at 379 (1). Rather, "[i]n cases where the new injury exception applies, the limitation period begins to run from the date the symptoms attributable to the new injury first manifest." (Citations omitted.) *Hosp. Auth. of Valdosta/Lowndes County v. Fender*, 342 Ga. App. 13, 18 (1) (a) (802 SE2d 346) (2017), cert. granted (December 11, 2017). See *Cleaveland*, supra at 379 (1) (the trigger that starts the statute of limitation is the date of the new injury, determined by "an occurrence of symptoms following an asymptomatic period"), and *Amu*, supra at 553.

In their briefs in support of their motions for summary judgment, the Appellees contended that the myxoma was the misdiagnosed condition and that Kelly Adams continuously experienced symptoms of it from the time of her initial ED admission in January 2013 until her stroke in September 2013. However, we believe that there are material questions of fact as to whether the symptoms Kelly Adams experienced between the January 2013 and September 2013 events actually stemmed from the myxoma. In addition to the conflicting evidence from Kelly Adams and the physician Appellees, as outlined above, there is also conflicting evidence from the parties' expert witnesses.

> Georgia case law requires only that an expert state an opinion regarding proximate causation in terms of reasonable medical probability or reasonable medical certainty. Moreover, causation may be established by linking the testimony of several different experts and must be determined in light of the evidentiary record as a whole. And questions regarding causation are peculiarly for the jury except in clear, plain, palpable and undisputed cases.

(Citations and punctuation omitted.) *Hosp. Auth. of Valdosta/Lowndes County*, supra at 19 (1) (b).

Both Kelly Adams's expert witness and Appellee Dr. McDonald agree that Kelly Adams suffered no brain injury from the January 2013 event. Kelly Adams's

11

expert, Dr. John Rothrock, stated in his affidavit that the myxoma caused her to suffer a TIA in January 2013, but that there was "no brain injury" until the September 2013 stroke. He deposed that further tests between the January and September 2013 events did not show "ischemic injury to the brain, acute or otherwise." Dr. McDonald deposed that he was unaware of any injury after the January 2013 event, and that Kelly Adams "didn't have any neurologic deficits consistent with cerebral ischemia between her original presentation in the emergency room and her stroke. It was all consistent with migraine."

As to the causes of Kelly Adams's symptoms between the January and September 2013 events, her expert, Dr. Rothrock, also deposed that he did not know "to a degree of medical certainty what was causing her headaches[.]" Her other expert, Dr. Kevin Sheth, deposed that it was "possible" that migraines caused the intervening symptoms, but that if the myxoma was present at the January 2013 event, cardiac lesions from it could have caused the headaches.

By contrast, one of the Appellees' experts, Dr. Robert J. Adams, deposed that Kelly Adams's intervening headaches were not a symptom of an ischemic event and were not consistent with a TIA, though her other symptoms reported at the January 2013 event were consistent with a TIA. Asked whether he believed any of the

symptoms Kelly Adams experienced between the January 2013 and September 2013 events related to the myxoma, Dr. Adams opined, "I don't see any evidence that anything was caused by the myxoma then."

Another of the Appellees' experts, Dr. Jay Schecter, deposed that Kelly Adams's blurred and double vision and the scotoma at the January 2013 event were not from a TIA, but rather were from a "migraine aura." Her "recurrent headaches after January 31st [2013] . . . which were associated with visual symptoms, . . . led me to believe she was suffering from migraines." He opined that the combination of visual symptoms between the January and September 2013 events – specifically, Kelly Adams's "blind spot" and the "scintillations" of the scotoma – meant "[t]hat has to be migraine. *There's nothing else that does that*." (Emphasis supplied.)

This testimony, coupled with Kelly Adams's own statements that the symptoms she experienced between the January and September 2013 events were "completely different" from those between the January event and the September stroke, amount to a wealth of conflicting evidence. Kelly Adams certainly experienced symptoms of *something* during the period between the January and September 2013 events. The question is whether those intervening symptoms related to a "new injury" in September 2013, i. e., the stroke which left her brain-damaged, or whether she was

13

instead asymptomatic for the "new injury" because her intervening medical issues stemmed from other underlying conditions such as migraine headaches or a Eustachian tube dysfunction.

As our Supreme Court determined, "[t]he true rule is that, when a misdiagnosis results in subsequent injury that is difficult or impossible to date precisely, the statute of limitation[] runs from the date symptoms attributable to the new injury are manifest to the plaintiff." (Citation and punctuation omitted.) *Cleaveland*, supra at 379 (1). Our Supreme Court has further determined that, "[u]nless there is a period when the patient is symptomless as to his or her original medical complaint, it is not possible to determine when the misdiagnosis has resulted in a 'new injury' as manifested by an occurrence of symptoms that should prompt medical attention." *Amu*, supra at 553. As outlined above, there is evidence supporting an asymptomatic period after Kelly Adams's January 2013 event as to the myxoma.[6]

In *Amu*, the plaintiff experienced rectal bleeding, and was diagnosed and treated for hemorrhoid in 2000. The bleeding stopped completely. The bleeding recurred in 2004, along with other symptoms, and the plaintiff was diagnosed with

---

[6] Of course, Kelly Adams was experiencing symptoms of something between January, 2013 and September, 2013. The issue, however, was whether it was from the myxoma or from migraines caused by a different health issue.

14

colon cancer which had spread and was terminal. Id. at 549. Our Supreme Court found that the *Amu* plaintiff was "symptomless" from the complaints that led him initially to visit the defendant doctor. The Court also found that "the statute of limitation[] ran [two years after the initial misdiagnosis as hemorrhoid] as to the pain, suffering or economic loss that [the plaintiff] suffered as a result of the misdiagnosis of his condition as it had existed two years earlier." Id. at 551. The high Court further found that the plaintiff's "metastatic cancer is a 'new injury' which did not exist at the time of the original misdiagnosis, but which is the proximate result of [the physician's] negligence." (Citation omitted.) Id. at 553. Thus, the Supreme Court found that the statute of limitation had not run as to this new injury. Id. at 554. Compare *Kaminer*, supra at 833 (1) (patient had the same AIDS condition before and after misdiagnosis, and only the symptoms of that condition worsened. Thus, there was no new injury).

In *Cleaveland*, supra, the plaintiff was diagnosed in 2000 with blood in his urine and a small cyst on his kidney, which his physician believed did not require treatment. In 2002, the plaintiff noticed a suspicious lump on his neck, which when biopsied, showed that he had metastatic kidney cancer. The plaintiff filed suit more than two years after the initial misdiagnosis, but within two years of finding the

15

cancer. Id. at 376. The defendant-physicians in *Cleaveland* argued that the plaintiff had no asymptomatic period. Id. at 380 (2). The Supreme Court found that

> The question is not whether [the plaintiff] was asymptomatic for the kidney cancer that was present at the time of the misdiagnosis. The subsequent injury exception applies here if, for a period of time following the misdiagnosis, [the plaintiff] was asymptomatic for the *metastatic* cancer that constitutes his injury.

(Citation and punctuation omitted.) Id. As the Supreme Court found, the plaintiff tested positive for microscopic hematuria after his initial diagnosis, but "this evidence does not demand a finding that, as a matter of law, he was experiencing a symptom of either kidney or metastatic cancer." Id. at 381 (2). The Court further found that even though the plaintiff in 2002 experienced night sweats which could be symptoms of metastatic cancer, and also saw blood in his urine which was from gross, rather than microscopic, hematuria, this also did not establish as a matter of law that it was a symptom of metastatic cancer rather than a bladder infection "or some other cause unconnected with the 'new injury.'" Id. at 381-382 (2).

Similarly, in the instant case, Kelly Adams's headaches and visual symptoms during the period between the January and September 2013 events do not demand a finding, as amply evidenced by the expert testimony cited above, that these symptoms

16

were caused by the myxoma rather than migraines or some other cause." As in *Cleaveland*, the instant case "is on summary judgment, and the evidence must be construed most favorably for [Kelly Adams]." Id. at 382 (2). A jury must decide the cause of the intervening symptoms Kelly Adams experienced between the January and September 2013 to ascertain whether or not the statute of limitation bars her claims.

*Judgment reversed. McFadden, P.J., and Rickman, J., concur*.