**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

***DEADLINES ARE NO LONGER TOLLED IN THIS***
***COURT. ALL FILINGS MUST BE SUBMITTED WITHIN***
***THE TIMES SET BY OUR COURT RULES.***

**June 29, 2021**

# In the Court of Appeals of Georgia

A21A0476. TARVER et al. v. SIGOUIN et al.

DOYLE, Presiding Judge.

In this medical malpractice/wrongful death action, plaintiff Ronnetta Tarver, as guardian and representative of two minor children and as administratrix of the estate of Patricia Tarver,[1] appeals from a superior court order granting summary judgment to defendants Anne Sigouin, CNM, and Life Cycle OB/GYN LLC. Tarver contends that the trial court erred because (1) issues of fact remain as to the medical malpractice claim, and the two-year statute of limitation did not bar her medical malpractice claim under the "new injury" exception, and (2) the wrongful death count

---

[1] Patricia was alive at the time the suit was filed. For purposes of simplicity, we refer to Patricia as the plaintiff in this case.

was timely filed, supported by the record, and not challenged at summary judgment. For the reasons that follow, we reverse.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[2]

So viewed, the record shows that on September 11, 2014, Patricia Tarver visited Atlanta Medical Center seeking treatment for vaginal bleeding aggravated by intercourse. She informed the medical staff that, "My period [has been] acting up – I'm late, but I don't think I'm pregnant. . . I had an abnormal Pap smear [and pain] that felt like cramps but it [isn't] cramps." She was diagnosed with "dysfunctional uterine bleeding" and instructed to see a private physician within a few days.

Patricia scheduled a Pap smear at Life Cycle on September 22, 2014, but she cancelled that appointment, instead going on November 7, 2014. She was seen by Dr. Kevin Edmonds for "abnormal uterine bleeding." Because Patricia was bleeding at

_____

[2] (Citation omitted.) *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459, 459 (1) (486 SE2d 684) (1997), citing OCGA § 9-11-56 (c).

2

the appointment, Edmonds did not perform an exam or Pap smear; instead he ordered a pelvic ultrasound and instructed Patricia to return in a week.

As part of the process of booking Patricia's appointment with Edmonds, Life Cycle had requested her medical records from Atlanta Medical Center, which faxed the record to Life Cycle shortly before Edmonds saw Patricia. Edmonds was not aware of the records at the time he saw Patricia, nor did he later consult the records, but the exam report from Atlanta Medical Center indicated that Patricia had disclosed the prior abnormal Pap smear at the Atlanta Medical Center.

Six days after seeing Edmonds, Patricia returned to Life Cycle for the ultrasound on November 13, 2014. The ultrasound report stated that the indication was "long periods," the assessment revealed "bilateral ovaries with immature follicles," and the recommendation was "either follicular phase of cycle or PCOS; clinical correlation needed." Patricia later deposed that "the tech told me that I had too many eggs, and that's why I was bleeding. And they put me on birth control."

At the same visit, Patricia was examined by Sigouin, a certified nurse midwife. Patricia asked Sigouin about a white vaginal discharge she experienced, and she discussed questions about her anxiety and asthma inhaler. Sigouin performed a physical exam, examined the discharge under a microscope, and diagnosed Patricia

with bacterial vaginitis; she also documented that Patricia's cervix appeared normal with no bleeding, and she did not perform a Pap smear due to the discharge. Sigouin later deposed that she was not aware of Patricia's history of abnormal uterine bleeding, and she approached the visit as a "problem focused visit," as opposed to "an annual exam where you'd normally do a Pap smear." At that time, she did not review Patricia's records showing the bleeding history, the reported abnormal Pap smear, and the Pap smear that was scheduled for September but not performed at the November 7 visit to Life Cycle.

Sigouin asked Patricia to return to Life Cycle in four weeks for a follow-up visit to review the ultrasound findings. Patricia did not return for that appointment, and she either cancelled or failed to attend appointments throughout 2015 and 2016 until November 30, 2016. At that visit, she complained of newly occurring pelvic pain and abnormal bleeding. She was examined and another ultrasound was ordered; no Pap smear was performed.

Patricia continued to experience intermittent abnormal uterine bleeding, but she did not follow up for examination or treatment at Life Cycle. By the summer of 2017, Patricia had moved to Tennessee, where she sought treatment for "right flank pain" at Blount Memorial Hospital. She was diagnosed with "acute uncomplicated cystitis."

4

In August and September 2017, Patricia sought care at Blount Memorial Hospital for abdominal pain and dysmenorrhea. On September 4, 2017, an ultrasound revealed a "suspicious uterine mass . . . what certainly may be a uterine cancer." Patricia's bleeding was treated successfully at that visit, and she attended follow-up visits through November 2, 2017, when she was diagnosed with stage four cervical cancer and began chemotherapy. By that time, the cancer had spread to Patricia's lymph nodes and bones. She ultimately died of complications from the metastasized cancer on February 14, 2019.

Before she died, Patricia filed this action on June 22, 2018, against Debra Johnson-Jordan, D.O., Dr. Edmonds, Nurse Midwife Sigouin, and Life Cycle. The complaint asserted professional negligence claims based on the failure to conduct a Pap smear or other cervical cancer screening during the two November 2014 visits to Life Cycle.[3] It did not allege negligence at the November 2016 visit to Life Cycle. On July 24, 2019, Ronnetta Tarver, as guardian and representative of Patricia's minor children and as administratrix of Patricia's estate, amended Patricia's complaint to substitute herself as the plaintiff and add a wrongful death claim.

---

[3] Life Cycle was named under a vicarious liability theory.

Following discovery, Sigouin and Life Cycle moved for summary judgment on the ground that the claims were barred by the two-year statute of limitation.[4] At oral argument, the defendants clarified that their statute of limitation argument went to the personal injury claim, not the wrongful death claim. Specifically, they argued that Patricia had never actually been diagnosed or mis-diagnosed in the November 2014 visits, so there could be no "new injury" arising from that alleged misconduct. In response, Patricia argued that the subsequent metastasis of the undiscovered cancer was a new injury that extended the statute of limitation, relying in part on *Cleaveland v. Gannon*,[5] a cancer-patient case stating that a new injury occurs "when a relatively benign or treatable precursor condition, which is left untreated because of the misdiagnosis, leads to the development of a more debilitating or less treatable condition."[6] She also pointed to expert testimony stating that it was a violation of the standard of care not to perform a Pap smear or other cancer screening at the

---

[4] Edmonds separately moved for summary judgment as to all of the claims; however, the trial court has not ruled on that motion, and Edmonds is not a party to this appeal.

[5] 284 Ga. 376 (667 SE2d 366) (2008).

[6] (Punctuation omitted.) Id. at 377 (1), quoting *Cleaveland v. Gannon*, 288 Ga. App. 875, 878 (1) (655 SE2d 662) (2007), affirmed by *Cleaveland*, 284 Ga. App. at 376.

November 2014 visits to Life Cycle, and this allowed the cancer to metastasize unabated.

Following the hearing, the trial court granted summary judgment to Life Cycle and Sigouin as to both claims. In its order, the trial court held that Edmonds and Sigouin had never made any diagnosis of Patricia, so she could not establish a "new injury" resulting from the November 2014 visits and extending the statute of limitation. Based on that ruling, the court likewise held that "the wrongful death claim is based on the allegation of medical malpractice, and the [c]ourt has ruled that there was no medical malpractice supported by the record in this case. Therefore, the wrongful death claim is also subject to summary judgment in favor of" Sigouin and Life Cycle. Patricia now appeals.

1. Patricia argues that the trial court erred by ruling that the "new injury" exception did not apply to this case on the ground that the record lacks any evidence of a misdiagnosis or failure to diagnose that would support a finding of medical malpractice. We agree.

The trial court's order is predicated on its conclusion that "the record does not support a finding that there was a misdiagnosis, nor a failure to diagnose, Ms. Tarver's cervical cancer by these Defendants." The trial court explicitly ruled that

7

"[t]here is simply no evidence in the record . . . that a [P]ap smear on that appointment or [a] follow-up appointment . . . would have shown the presence of cervical cancer." Based on this, the court ruled that there could be no new injury arising from the November 2014 visits that extended the statute of limitation.

As a threshold matter, we emphasize that at the summary judgment stage, "we do not resolve disputed facts, reconcile the issues, weigh the evidence, or determine its credibility, as those matters must be submitted to a jury for resolution."[7] Similarly, ordinary questions of negligence and causation are "peculiarly questions for the jury except in clear, plain, palpable[,] and undisputed cases."[8]

(a) *Evidence of breach of the standard of care by Edmonds*.[9]

When viewed under the summary judgment standard, the record contains evidence that would support a finding that the standard of care was breached in each

---

[7] (Citations and punctuation omitted.) *Pneumo Abex, LLC v. Long*, 357 Ga. App. 17, 19 (849 SE2d 746) (2020), quoting *Tookes v. Murray*, 297 Ga. App. 765, 766 (678 SE2d 209) (2009).

[8] (Punctuation omitted.) *Adams v. McDonald*, 346 Ga. App. 464, 469 (816 SE2d 454) (2018), quoting *Hosp. Auth. of Valdosta/Lowndes County v. Fender*, 342 Ga. App. 13, 19 (1) (b) (802 SE2d 346) (2017).

[9] We address Edmonds's conduct to the extent that Life Cycle's liability is predicated on a respondeat superior or agency theory.

of the November 2014 visits. With respect to Edmonds, there is deposition testimony from Patricia's medical expert that he should have done a speculum exam on the November 7, 2014 visit, and a Pap smear procedure at that visit was "highly likely" to have returned an abnormal result. Further, there was testimony that Edmonds should have reviewed or requested Patricia's medical records showing that she had an abnormal Pap smear result in the past.

In addition to this, there was testimony that given Patricia's history and symptoms, and *aside from any Pap smear test or result*, "she needed a physical examination and cervical biopsies. . . . [I]f a thorough examination was performed, a lesion would have been seen . . . because I believe the cancer was there at that time. So I believe that they would have seen the cancer and biopsied it, and then they would have documented that there was a cancer." This is consistent with an expert affidavit stating that:

> the standard of care required . . . Edmonds . . . at a minimum perform a physician exam, [P]ap smear, and cervix biopsies as a result of [Patricia's] significant complaints of many episodes of bleeding and bleeding with intercourse. A [P]ap smear and cervix biopsy was never considered, ordered, or performed. [Edmonds] violated the standard of care in this regard. In other words, had a physician exam, [P]ap smear, and cervix biopsy been performed on [Patricia] at Life Cycle OB/GYN

in November 2014, [Patricia's] cancer would have been detected in its early treatable stages.

To a reasonable degree of medical certainty, a treatable and curable cervix cancer stage I/II was present in [Patricia] on 11/7 and 11/13 and was not diagnosed as a result of Dr. Edmond's failure to examine and work-up [Patricia].

Last, there was expert testimony that "there was cancer there at the end of [20]14. . . . [I]f you've got Stage 4 cervical cancer in [20]17, then to a reasonable degree of medical probability, you've got cervical cancer in the end of 2014. . . . [I]f there's an advanced cancer in [20]17, there's something there at the end of [20]14."

None of this evidence was excluded on the basis of its degree of certainty or reliability, nor do the appellees argue now that it should be. When viewed in the light most favorable to Patricia, this testimony would support a finding that Edmonds's treatment decisions during the November 2014 visit breached the applicable standard of medical care, which breach allowed Patricia's existing, undetected early-stage cancer to metastasize untreated. The trial court's ruling was predicated on a determination that Edmonds merely followed a differential diagnosis procedure requiring follow up visits that Patricia did not attend, and he neither mis-diagnosed Patricia or failed to diagnose Patricia. But this determination ignores the expert

testimony that Edmond's treatment itself failed to meet the standard of care at the time Edmonds saw Patricia and prematurely resolves those conflicting factual theories, which remain for the jury.

Similarly, as noted by the defendants and trial court, there is a dispute among Edmonds, Sigouin, and Patricia's experts as to the utility of performing a Pap smear or other examination due to the bleeding and discharge that Patricia presented with in November 2014.[10] But that dispute, on its face, necessitates the *denial* of summary judgment, not the grant of summary judgment, at least on that particular ground. At this stage in the proceeding, "it is precisely because there are bits of evidence in the record which create genuine issues of material fact that summary judgment is not appropriate . . . . It is not the role of [courts], but is the role of a jury to sort through the evidence, resolve conflicts, and make findings of fact based on the evidence it finds credible."[11]

(b) *Evidence as to the breach of standard of care by Sigouin*.

---

[10] Edmonds deposed that he did not order a Pap smear because the results can be skewed by concurrent bleeding. But this was contradicted by Patricia's expert who testified that the standard of care required a Pap smear on November 7, 2014: "With the current Pap testing, which is done with liquid based cytology, bleeding is not a contraindication or a reason not to do the test."

[11] *Montgomery v. Barrow*, 286 Ga. 896, 898 (1) (692 SE2d 351) (2010).

Similarly, with respect to Sigouin, there is an expert affidavit, unchallenged on appeal, averring that:

> It is my opinion that Anne Sigouin, CNM in providing care and treatment to Patricia Tarver did not [meet the applicable standard of care] . . . by failing to properly address and treat Ms. Tarver's condition. . . . [T]o meet the standard of care[,] CNM Sigouin should have followed up on the prior week's visit regarding the abnormal bleeding and whether the pelvic ultrasound had been done. A [P]ap smear history should have been documented. Since the cervix appeared normal [to Sigouin], a [P]ap smear should have been obtained during this examination and the result followed up. It does not appear that any of this was done; therefore, CNM Sigouin failed to comply with the standard of care.

In light of the evidence of a negligent act or omission at Patricia's November 2014 visits to Life Cycle, the trial court erred by ruling as a matter of law that the record contained no evidence of a failure to diagnose or a misdiagnosis.[12]

(c) *"New injury" rule operates to extend the statute of limitation.*

Because the alleged breach of the standard of care occurred in the November 2014 visits, ordinarily Patricia would need to bring her claim within two years of

---

[12] See, e.g., *Ross-Stubblefield v. Weakland*, __ Ga. App. __ (Case No. A21A0053, decided May 20, 2021) ("There was expert testimony on both sides regarding the standard of care, and it was the jury's role to weigh this testimony.").

those visits.[13] Instead, she filed this action in June of 2018, so she relies on the "new injury" exception to the general statute of limitation.

As noted above, in *Cleaveland v. Gannon*, the Georgia Supreme Court clarified the rule:

> [T]he "new injury" exception . . . applies in cases in which the patient's injury arising from the misdiagnosis occurs subsequently, generally when a relatively benign or treatable precursor condition, which is left untreated because of the misdiagnosis, leads to the development of a more debilitating or less treatable condition. Thus, the deleterious result of a doctor's failure to arrive at the correct diagnosis in these cases is not pain or economic loss that the patient suffers beginning immediately and continuing until the original medical problem is properly diagnosed and treated. Rather, the injury is the subsequent development of the other condition.[14]

Applying this rule, the *Cleaveland* opinion addressed a scenario in which a plaintiff "did not merely experience subsequent symptoms of a worsening of his misdiagnosed, but treatable, kidney cancer,"[15] but instead experienced a metastasis causing additional injury to other organs. The Court ruled that the statute of limitation

---

[13] See OCGA § 9-3-71 (a).

[14] 284 Ga. at 377 (1), quoting *Cleaveland*, 288 Ga. App. at 878 (1).

[15] *Cleaveland*, 284 Ga. at 379 (1).

commenced anew when, "[a]t some point, the magnitude of his undiagnosed condition evolved into a 'new injury' in which other internal organs, that were unaffected at the time of the misdiagnosis, were compromised and the cancer became life-threatening."[16] This occurs when symptoms attributable to the newly metastasized cancer are manifest to the plaintiff.[17]

Here, the record contains evidence of an analogous scenario. There is evidence of medical negligence in November 2014 and that Patricia's cancer metastasized after that date, affecting other parts of her body not previously involved and dramatically reducing her chances of survival. That there was a gap in care from November 2014 to November 2016 does not demand judgment as a matter of law. Instead, it presents a factual question as to causation to be resolved by the jury, particularly in light of the disputes in the record.[18] These disputes are highlighted by Patricia's experts who have testified that a different treatment in November 2014 would have detected a cancer that was present at that time, and this would have caused a different trajectory of care.

---

[16] Id.

[17] See id. at 383 (3).

[18] See *Adams*, 346 Ga. App. at 469.

14

Patricia herself deposed before her death that when she saw Sigouin, she told Sigouin about her concern about cervical cancer

> because my mom had it, and I kept bringing that up. I wanted to be checked for this. I didn't want an ultrasound. I wanted to be checked for this because I felt like that's what was going on . . . based on what my mom had. . . . [Sigouin] knew me personally. So we had a good relationship, and I talked to her like she was my friend, not like a doctor. . . . I told her I thought I had cervical cancer. And they kept telling me that the bleeding was normal[,] and they wanted to do other tests first.

Based on this record, the unresolved factual issues preclude a determination as a matter of law that no negligence occurred and that a different course of conduct in November 2014 would not have mattered. There is evidence that, at the earliest, Patricia's cancer manifested its spreading in November 2016, when she returned to Life Cycle with new pelvic pain (even though the cancer remained undiagnosed), and certainly when an ultrasound showed a uterine mass in the fall of 2017. Under these circumstances, Patricia's complaint, filed in June 2018, was within the time frame applicable to the "new injuries" that occurred as her cancer metastasized.[19]

---

[19] See *Cleaveland*, 284 Ga. at 383 (3) ("Because [plaintiffs] filed their complaint within two years after this symptom attributable to the metastatic cancer first appeared, the trial court correctly ruled that the [defendants] are not entitled to summary judgment on the basis of the statute of limitation[]."), quoting *Cleaveland*,

15

2. Patricia also challenges the trial court's ruling that the wrongful death claim is barred. The trial court did not address the fact that the wrongful death claim was added within two years of Patricia's death,[20] instead sua sponte ruling that the wrongful death claim failed because it was derivative of the malpractice claim that it had ruled was unsupported by the record. In light of our holding in Division 1, this was error.

*Judgment reversed. Reese and Brown, JJ., concur.*

---

288 Ga. App. at 880 (1).

[20] See OCGA § 9-3-71 (a); *Wesley Chapel Foot & Ankle Center, LLC v. Johnson*, 286 Ga. App. 881, 885 (650 SE2d 387) (2007) ("Mrs. Johnson brought her wrongful death claim within two years after the date on which Mr. Johnson died, by filing an amendment to a medical malpractice action that timely asserted other claims arising out of the same alleged medical malpractice, where such action had been pending since before the expiration of five years after the date on which the negligent or wrongful act or omission occurred and when Mrs. Johnson was entitled to amend her pleading as a matter of course and without leave of court. Under these circumstances, Mrs. Johnson's wrongful death claim is timely both in terms of the statute of repose and the statute of limitation.").